United States Court of Appeals,

Eleventh Circuit.

No. 96-3121.

William D. SCALA, Plaintiff-Appellant,

v.

CITY OF WINTER PARK, a municipality, Defendant-Appellee.

July 10, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 95-329-CIV-ORL-18), Kendall Sharp, Judge.

Before CARNES, Circuit Judge, and HENDERSON and GIBSON[*], Senior Circuit Judges.

CARNES, Circuit Judge:

It is well-established that a municipality may be held liable under 42 U.S.C. § 1983 for a single illegal act committed by one of its officers, but not on a theory of *respondeat superior.* Instead, § 1983 liability may be premised upon a single illegal act by a municipal officer only when the challenged act may fairly be said to represent official policy, such as when that municipal officer possesses final policymaking authority over the relevant subject matter. The dispositive issue in this appeal is whether the City of Winter Park's City Manager and his subordinate, the Public Safety Director, are final policymakers with respect to employment termination decisions at the City's fire department. We hold that they are not, because their decisions are subject to meaningful administrative review by the City Civil Service Board.

**I. BACKGROUND FACTS AND PROCEDURAL HISTORY**

William Scala worked for the City of Winter Park Fire Department as a paramedic and firefighter from 1979 until he was fired in 1992. By 1985, he had been promoted to the rank of lieutenant. In 1989, Scala outwardly and strongly supported mayoral hopeful Russell Troutman in his run against the eventual winner of that office, David Johnson. According to Scala, his support

[*]Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

of Troutman led to a campaign within the fire department to have him discharged.[1]

In September 1991, Battalion Chief James Knackert charged Scala with insubordination at a fire scene. Later, Knackert attempted to withdraw that charge, because he felt he had been pressured by other battalion chiefs to make the charge in the first place. However, City Manager Anthony Barrett refused to allow Knackert to withdraw the charge. As a result of the insubordination charge, Scala was suspended for three days and demoted from lieutenant to firefighter. As he was entitled to do under the City Charter and applicable Civil Service Code, Scala appealed his suspension and demotion to the City Civil Service Board. On January 29, 1992, the Board reversed the demotion, but added fifteen days to the suspension.

On March 11, 1992, City Manager Barrett appointed James Younger to the position of Public Safety Director. In that position, Younger served simultaneously as the chief of the City's fire and police departments. At the time of Younger's appointment, Scala had a good relationship with him. However, that relationship deteriorated quickly after Younger began to pursue a romance with, and possibly harass, a married female fire inspector named Lyn Wright. Scala told Younger that it was unwise to pursue a relationship with Wright and that Scala would have to tell the truth about the situation if trouble ever arose over it.

On April 20, 1992, new Battalion Chief Bobby Ferrell leveled ten disciplinary charges against Scala. A committee was assembled to investigate those charges, the most serious of which was that Scala had lied in his prior disciplinary proceeding. Younger took personal responsibility for investigating the untruthfulness charge, and the remaining charges were investigated by the committee. The committee recommended that Scala be found guilty of five of the nine charges it was assigned to investigate, and it recommended that Scala be terminated. Although he had never interviewed Scala about the matter, Younger concluded that Scala was also guilty of the untruthfulness charge. Thereafter, Younger notified Scala that he was proposing that Scala be

---

[1]This appeal concerns only a question of law. The facts are largely, but not entirely, undisputed. Because the parties' factual disputes are not relevant to the dispositive legal issue in this case, we need not discuss those disputes in this opinion. Suffice it to say that for present purposes, we have resolved all of the factual disputes in favor of Scala.

terminated on the basis of the six charges.

About three weeks later, on June 22, 1992, Fire Inspector Wright complained to Younger about his alleged sexual harassment of her and demanded that it stop. A meeting was then set up for discussion of Wright's complaint in City Manager Barrett's office. That meeting was scheduled for July 3, 1992. Because Younger feared Scala's previously-stated support for Wright, Younger wanted Scala out of the department.

On June 25, 1992, Scala met with Younger and attempted to respond to the six charges that the committee and Younger had found to have merit. Afterward, Younger informed City Manager Barrett that Scala had failed to refute any of the charges. Younger and Barrett then mutually agreed that Scala should be terminated. On June 29, 1992, Younger gave Scala written notice of his termination. As with his prior suspension and demotion, Scala appealed his termination to the City Civil Service Board. The Board held a public hearing on the issue and unanimously upheld Scala's termination.

After the Board upheld Scala's termination, Scala filed a 42 U.S.C. § 1983 claim against the City. In his complaint, Scala alleged that his termination was in violation of his First Amendment rights to free speech and free association. The free speech claim was based on the theory that his termination was motivated to suppress speech about Younger's alleged sexual harassment of Wright. The free association claim was based on the theory that the termination was motivated by Scala's support of Troutman in the 1989 mayoral race. Yet, Scala did not sue Younger, Barrett, or any other municipal official. He sued only the City.

The district court granted summary judgment to the City on the ground that neither Younger nor Barrett were final policymakers with respect to employment termination decisions at the fire department, because the decision to terminate Scala was subject to plenary review by the City Civil Service Board. This appeal followed.

## II. STANDARD OF REVIEW

This Court applies a *de novo* standard of review to a district court's grant of summary judgment. *See, e.g., Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 535 (11th Cir.1992).

Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir.1990). "All evidence and reasonable factual inferences drawn therefrom are reviewed in the light most favorable to the party opposing the [summary judgment] motion." *Warren v. Crawford,* 927 F.2d 559, 561-62 (11th Cir.1991) (citation omitted).

This appeal requires us to decide whether City Manager Barrett or Public Safety Director Younger are final policymakers with respect to terminations from the fire department, such that the City may be held liable under 42 U.S.C. § 1983 if their decisions are unconstitutional. As the Supreme Court has made plain, that issue presents a question of law:

> As with other questions of state law relevant to the application of federal law, *the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question* to be resolved by the trial judge before the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989) (emphasis added) (original emphasis omitted) (citation and internal quotation marks omitted). As with all conclusions of law related to the grant of summary judgment, we review *de novo* the district court's determination that neither Barrett nor Younger are final policymakers with respect to terminations from the fire department. *See, e.g., Bannum, Inc. v. City of Fort Lauderdale,* 901 F.2d 989, 996 (11th Cir.1990).

### III. ANALYSIS

A. *MONELL* 'S "POLICY OR CUSTOM" REQUIREMENT

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may not be held liable under 42 U.S.C. § 1983 on a theory of *respondeat superior.* Instead, municipalities may only be held liable for the execution of a governmental policy or custom. As the *Monell* Court explained:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by *those whose edicts or acts may fairly be said to represent official policy,* inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037-38 (emphasis added).

Later, in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court clarified *Monell's* "policy or custom" requirement. In *Pembaur,* the Court explained that "municipal liability may be imposed for a single decision by municipal *policymakers* under appropriate circumstances." *Id.* at 480, 106 S.Ct. at 1298 (majority opinion) (emphasis added). In particular, "where action is *directed by those who establish governmental policy,* the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481, 106 S.Ct. at 1299 (majority opinion) (emphasis added). Thus, liability may arise from "a course of action tailored to a particular situation and not intended to control decisions in later situations," *id.* at 481, 106 S.Ct. at 1299 (majority opinion), provided that "the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered," *id.* at 481, 106 S.Ct. at 1299 (plurality opinion) (emphasis added) (footnote omitted).[2]

In light of *Pembaur,* this Court has interpreted *Monell's* policy or custom requirement to preclude § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion:

> [T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. *Rather, the delegation must be such that the subordinate's discretionary decisions* are not constrained by official policies and *are not subject to review.*

*Mandel v. Doe,* 888 F.2d 783, 792 (11th Cir.1989) (emphasis added) (citations omitted). That interpretation is based on the Supreme Court's decision in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). Although *Praprotnik* was a plurality

---

[2]Recently, the Supreme Court appeared to cast some doubt on its *Pembaur* decision by declining to address "[w]hether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time." *Board of County Comm'rs v. Brown,* --- U.S. ----, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). Nevertheless, the Court stopped far short of overruling *Pembaur* in *Brown.* Unless and until the Supreme Court overrules *Pembaur,* or Congress adjusts § 1983 municipal liability standards, the *Pembaur* decision remains binding on this Court. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989) (admonishing the courts of appeals to leave to the Supreme Court "the prerogative of overruling its own decisions").

opinion, the decision merits discussion in further detail, because our circuit's law in the area has been molded around that decision's reasoning and because the facts of *Praprotnik* are closely analogous to those of this case.

In *Praprotnik,* a municipal employee of that name was transferred and subsequently was laid off from his job with the City of St. Louis, Missouri. *Id.* at 114-16, 108 S.Ct. at 920. The municipal officials who were responsible for initiating the transfer and layoff, respectively, were: (1) Frank Hamsher, the Director of the St. Louis Community Development Agency; and (2) Robert Killen, the "Director of Heritage." *Id.* at 115-16, 108 S.Ct. at 920. Praprotnik sued the City of St. Louis, alleging that he had been penalized for exercising his First Amendment rights, *i.e.,* that the transfer and layoff were in retaliation for his earlier exercise of his right to appeal a disciplinary suspension to the St. Louis Civil Service Commission. *Id.* Before filing suit, Praprotnik appealed the layoff decision to the Commission, but those proceedings were suspended when Praprotnik filed his federal lawsuit. *Id.*

The district court entered judgment on a jury verdict for Praprotnik, and the Eighth Circuit affirmed in part. *Id.* at 117, 108 S.Ct. at 920. In doing so, the Eighth Circuit reasoned that Hamsher and Killen were municipal policymakers who could subject the city to § 1983 liability for their employment decisions—even though those decisions were reviewable by the Civil Service Commission. *Id.* at 117-18, 108 S.Ct. at 921. The Supreme Court reversed, and its explanation for that decision is so directly on point that we think it worthwhile to reproduce a considerable part of it:

> The Court of Appeals concluded that "appointing authorities," like Hamsher and Killen, who had the authority to initiate transfers and layoffs, were municipal "policymakers." The court based this conclusion on its findings (1) that the decisions of these employees were not individually reviewed for "substantive propriety" by higher supervisory officials; and (2) that the Civil Service Commission decided appeals from such decisions, if at all, in a circumscribed manner that gave substantial deference to the original decisionmaker. 798 F.2d at 1174-1175. We find these propositions insufficient to support the conclusion that Hamsher and Killen were authorized to establish employment policy for the city with respect to transfers and layoffs.

*Id.* at 129, 108 S.Ct. at 927. After quoting the St. Louis City Charter to establish that the Civil Service Commission had the final authority over transfers and layoffs, the Supreme Court continued:

This case therefore resembles the hypothetical example in *Pembaur:* "[I]f [city] employment policy was set by the [Mayor and Aldermen and by the Civil Service Commission], only [those] bod[ies'] decisions would provide a basis for [city] liability. This would be true even if the [Mayor and Aldermen and the Commission] left the [appointing authorities] discretion to hire and fire employees and [they] exercised that discretion in an unconstitutional manner...." 475 U.S. at 483, n. 12, 106 S.Ct. at 1300, n. 12. A majority of the Court of Appeals panel determined that the Civil Service Commission's review of individual employment actions gave too much deference to the decisions of appointing authorities like Hamsher and Killen. Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. See supra, at 124-25, 108 S.Ct. at 925. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official. But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

*Praprotnik,* 485 U.S. at 129-30, 108 S.Ct. at 927-28 (alterations in original).

This Court's post-*Praprotnik* decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review. *See Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 638 (11th Cir.1991) (holding that a mayor was not a final policymaker with respect to zoning decisions where the city charter provided that the city counsel could override the mayor's veto of zoning ordinances); *Mandel,* 888 F.2d at 792-94 (recognizing that a municipal officer has final policymaking authority when his decisions "are not subject to review" and holding that discretionary review initiated by the municipal official himself does not prevent the official from being a final policymaker); *cf. Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir.1996) (accepting concession that city police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager); *Martinez v. City of Opa-Locka,* 971 F.2d 708, 713-15 (11th Cir.1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

Our *Manor Healthcare* decision is particularly illuminating. In *Manor Healthcare,* a nursing home corporation filed a § 1983 suit against the City of Sunrise, Florida. 929 F.2d at 635. As the basis for its claim against the city, the plaintiff corporation contended that the mayor of Sunrise had extorted $30,000 from it in exchange for the mayor's cooperation in securing a special zoning exception for the nursing home. *Id.* at 636-37. We held that wrongful acts committed by the mayor in his administration of the city's zoning department could not subject the city to § 1983 liability, even though the city charter gave the mayor "the power to oversee and administer all departments and agencies of the city, including the planning and fire departments." *Id.* at 637. That was not enough for municipal liability, because the charter also gave the city council the power to override the mayor's veto on zoning matters, and as a result "[the mayor] was not the ultimate policymaking authority regarding zoning issues in the City of Sunrise." *Id.* (citing *Praprotnik* ).

As *Manor Healthcare* and our other post-*Praprotnik* cases make plain, the principles espoused by a plurality of the Supreme Court in *Praprotnik* have become embedded in the binding precedents of this circuit. Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.

Scala protests that the effect of this rule of law is to unfairly insulate municipalities from liability for the wrongful conduct of subordinate officials. That argument is problematic for at least two reasons. First, if *Praprotnik's* final policymaker requirement, as embedded in our circuit law, creates an undesireable barrier to municipal liability, that is not a problem this panel can solve. We must take our circuit's law as we find it unless and until the Supreme Court, Congress, or this Court sitting en banc changes it. Second, we note that the rule of *Praprotnik* does not leave plaintiffs such as Scala without a remedy. One remedy is provided them by the very means of administrative review that serves to insulate municipalities from *respondeat superior* liability for the conduct of rogue subordinates. Another such remedy is an individual-capacity civil action brought against the subordinate officials themselves. In this case, for strategic or other reasons, Scala chose not to pursue any legal remedy he had against Younger or Barrett. That Scala made the strategic choices he did is no reason for us to abandon our post-*Praprotnik* precedents.

## B. APPLICATION OF THE *MONELL* STANDARD TO THIS CASE

In this case, there is no question that the Civil Service Board had the authority to review the decision of Barrett and Younger to terminate Scala. In fact, Scala concedes that "[t]he Board had the power to review the City Manager's decision." That concession is hardly surprising, given that: (1) the governing city regulations provide for such review; (2) the Board did actually review the termination decision in this case; and (3) Scala had previously used the Board's review procedures to his benefit, when he convinced the Board to reverse his earlier demotion.

Despite the power vested in the Board to review termination decisions within the fire department, Scala contends that either Barrett or Younger, or both, should be considered final policymakers. He argues that Barrett and Younger are final policymakers, because their decisions are not automatically reviewed by the Board; an employee has to appeal to the Board before it will take any action to review decisions made by the appointing authorities. However, that is essentially the same argument that the *Praprotnik* plurality rejected, and that this Court rejected in *Manor Healthcare. See Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928 (explaining that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority"); *Manor Healthcare,* 929 F.2d at 638 ("Manor cannot now contend that the city council would have deferred to [the mayor's] judgment on all zoning issues since Manor failed to trigger the city council's authority.").[3]

In contending that the absence of automatic administrative review transforms Barrett or Younger into final policymakers, Scala makes no effort to distinguish *Praprotnik* or *Manor Healthcare.* Instead, he relies on a pre-*Praprotnik,* pre-*Pembaur* case from this circuit, *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.1984). As Scala correctly points out, we held in *Wilson* that "even where an appellate process exists to review an official's decision, that official may be held to

---

[3]Even putting precedent aside, we are puzzled by the suggestion that administrative review of personnel decisions should occur without any initiative by the supposedly aggrieved party. The board can hardly be expected to conduct a plenary review of every personnel decision that Barrett and Younger make. Why should it expend time and resources reviewing decisions that no one is complaining about? Because Barrett and Younger are not likely to complain to the Board about their own decisions, common sense seems to dictate that aggrieved employees, like Scala, should initiate Board review if they wish to have it.

exercise final authority within the city." *Id.* at 1546. It is also true that in *Wilson,* we found it significant that "an appeal did not automatically follow" a police chief's termination decision. *Id.* The trouble with Scala's argument, however, is that *Wilson* is no longer good law, in light of *Pembaur, Praprotnik,* and their progeny in this circuit.[4]

In light of *Praprotnik* and this circuit's precedents applying the principle it announced, it is clear that Barrett and Younger do not become final policymakers for § 1983 purposes simply because persons who disagree with their decisions have to file an appeal in order to have those decisions reviewed. The City's governing documents provide employees with an opportunity for meaningful administrative review of termination decisions at the fire department, and there is no evidence that the Board merely rubber-stamps the decisions of the appointing authorities. In fact, Scala's own prior experience with the Board demonstrates to the contrary, because Scala was able to convince the Board to reverse the demotion he had received in an earlier disciplinary proceeding.

Because the City Civil Service Board has the power to reverse any termination decision made by Barrett or Younger, neither of them is a final policymaker with respect to termination decisions at the fire department. The Board reviewed Scala's termination. The result was an affirmance, but there is no evidence (and Scala does not even allege) that the Board's decision approved any improper motive that Barrett or Younger may have had. *See Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir.1996) (affirming summary judgment for city in § 1983 employment case where plaintiff presented no evidence that the city's reviewing authority approved any improper motive underlying the plaintiff's demotion). Accordingly, the district court correctly granted summary judgment in favor of the City.[5]

---

[4]We note that another part of *Wilson* is at odds with the Supreme Court's subsequent decision in *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989), which established that the final policymaker issue is a question of law for the trial judge. In *Wilson,* by contrast, we had held that the final policymaker issue was properly decided by the jury as a question of fact. 733 F.2d at 1547. In light of subsequent Supreme Court decisions, little, if anything, of *Wilson's* final policymaker analysis survives.

[5]Although the district court properly concluded that neither Barrett nor Younger are final policymakers with respect to termination decisions at the fire department, we disagree with the district court's assertion that even if Younger or Barrett possessed final decision-making authority with respect to Scala's termination, municipal liability could not attach "merely" for

## IV. CONCLUSION

Barrett and Younger may or may not have had proper motives when they initiated Scala's termination from the City's fire department, but even if their decision was improperly motivated, the City cannot be held liable for it under § 1983, because neither Barrett nor Younger are final policymaking authorities with respect to terminations from the fire department. There being no evidence that the Board ratified any improper basis for Scala's termination, the district court's judgment in favor of the City is AFFIRMED.

---

that reason. To the contrary, if Younger or Barrett had *final (i.e.,* nonreviewable) decision-making authority with respect to termination decisions at the fire department, they would be final policymakers in that subject area, and thus could subject the City to liability if the decisions they made in that capacity were illegal ones. *See, e.g., Pembaur,* 475 U.S. at 483-84, 106 S.Ct. at 1299-1300. In this case, however, the availability of meaningful Board review prevents termination decisions made by Younger or Barrett from being "final" for § 1983 purposes, and that precludes the City from being held liable for those decisions.