Gary Cremeens, formerly a firefighter for the City of Montgomery (the "City"), appeals from a summary judgment entered in favor of the City. At issue is whether Cremeens presented substantial evidence that the City, acting through Fire Chief R.W. Grier and Deputy Fire Chief J.L. Fulmer,[1] wrongfully terminated Cremeens's employment with the Montgomery Fire Department because of his membership in Montgomery Firefighters Association Local 1444 ("Local 1444").
 "When reviewing the disposition of a motion for a summary judgment, this Court uses the same standard of review the trial court uses `in determining whether the evidence before the court made out a genuine issue of material fact.' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988). When a party moving for a summary judgment makes a prima facie showing that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Substantial evidence is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In reviewing a ruling on a motion for a summary judgment, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Blackwood v. Davis, 613 So.2d 886
(Ala. 1993)."
Machen v. Childersburg Bancorporation, Inc., 761 So.2d 981,984 (Ala. 1999). Moreover, "a court may not determine the credibility of witnesses on a summary judgment motion . . . ." Phillips v. Wayne'sPest Control Co., 623 So.2d 1099, 1102 (Ala. 1993). *Page 1192 
In 1984, the City of Montgomery Fire Department hired Cremeens as a firefighter. Also in 1984, Greer was appointed chief of the Montgomery Fire Department. At the time Cremeens was hired, the fire department had in place a policy stating that each firefighter had to remain below a maximum allowable weight. The policy was to be applied equally to all personnel. Deputy Chief Fulmer was in charge of administering this policy. Each firefighter's maximum allowable weight was determined by means of a chart showing heights and corresponding weights. Each fire department employee was weighed at least once a month, but he or she could be weighed more frequently if the chief deemed it necessary. The department's manual provides the following sanctions for violating the weight policy:
 "The fire department will use a three-step disciplinary process to correct the problem with firefighters who are habitually overweight. The disciplinary action will be determined by the number of violations within the last twelve months.
"First step is a five day (40 hour) suspension.
"Second step is a fifteen day (120) hour suspension.
"Third step is termination of employment."
(C. 183.) (Emphasis added.) The department gives each employee suspended for violating the weight policy a 30-day grace period after each suspension within which the employee will be allowed to return to work if the employee's weight reaches an acceptable limit. The only means used to determine a firefighter's maximum allowable weight at the time of Cremeens's initial employment was the height-weight chart.
Cremeens, a competitive bodybuilder, frequently worked out with weights. He maintains that these workouts, by increasing his muscle mass, tended to make him heavier than others of similar height and build.
On July 3, 1985, Lt. B.R. Pilgrim ordered Cremeens to serve 10 consecutive night-watch shifts as a punishment for violating the department's weight policy. (C. 202.) On August 5, 1985, Cremeens weighed in at 209 pounds, 10 pounds over the maximum allowable weight of 199 pounds for a male of his height. On October 3, 1985, Cremeens weighed in at eight pounds over the maximum allowable weight. That same day, Cremeens discussed the height-weight chart with an undercover investigator for the City. Cremeens told the investigator that he did not think the department's weight policy was fair to bodybuilders and that he should not be fired merely because his weight exceeded the maximum allowable weight shown on the height-weight chart for someone of his height. He did not believe the height-weight chart was a fair way to determine a firefighter's maximum allowable weight because, Cremeens said, the chart failed to take into consideration how much of a person's body mass was fat and how much was muscle. According to Cremeens, the investigator placed a letter in Cremeens's personnel file concerning this discussion.
On July 27, 1985, Lt. Pilgrim placed a letter that was highly critical of Cremeens in Cremeens's personnel file. In response to Lt. Pilgrim's letter, the members of Local 1444 called a special meeting at which the members were to take a vote in support of Cremeens. Before the meeting, Chief Grier called Pete Wethington, the president of Local 1444, and told Wethington that he had heard about the special meeting. He further told Wethington that if the members of Local 1444 voted to support Cremeens, the members of the union would "have to pay." Two days after a vote was taken to support Cremeens, Wethington was demoted from sergeant to firefighter and was transferred to another fire station. On October 10, 1985, about six weeks after Lt. Pilgrim had placed his letter in Cremeens's personnel file, Capt. J.B. Tillerson sent a similar *Page 1193 
letter concerning Cremeens to Deputy Chief C.R. Summerlin.
On October 11, 1985, Local 1444 sued the City in federal district court, alleging that the City was engaging in intimidation, coercion, and retaliation against members of the union, including Wethington and Cremeens. Local 1444 alleged that the City had engaged in various activities, including the retaliatory demotion of some Local 1444 members, in response to the union's criticism of fire-department policies. The district court ruled in favor of the City. Local 1444 appealed. The United States Court of Appeals for the Eleventh Circuit vacated the district court's decision and remanded the case. On March 31, 1988, the parties entered into a settlement agreement, pursuant to which the firefighters could join Local 1444 and no one would be discharged or discriminated against because of membership in the union.
Shortly after the settlement agreement was entered into, the City Council for the City of Montgomery adopted Ordinance No. 25-88, which provided that supervisory personnel in the Montgomery Fire Department could not belong to Local 1444. Although firefighters could join the union, they would not be promoted to any supervisory positions if they maintained their membership. At that time, Cremeens was serving as secretary of Local 1444.
On March 7, 1986, Cremeens weighed in at 22 pounds over his maximum allowable weight. Deputy Chief Summerlin notified Cremeens that he had 30 days to bring his weight within the maximum allowable weight under the height-weight chart, or he would face disciplinary action. Approximately three weeks later, Cremeens was weighed again. Cremeens had lost 12 pounds; he weighed 209 pounds, which was within 10 pounds of his maximum allowable weight.
On March 26, 1986, Capt. J.B. Tillerson sent a letter to Chief Grier stating that Tillerson thought that Cremeens was "thumbing his nose" at the Department's weight policy, and that his refusal to lose weight was creating a morale problem among those firefighters who were earnestly attempting to stay within the weight limits. (C. 199.)
At some point in 1986, the fire department adopted the body-fat measurement as an alternative method for determining an employee's maximum allowable weight. Such a measurement indicates the percentage of fat in a person's body. Under this method, an employee could opt to have his or her body fat measured, rather than have the maximum allowable weight calculated by the height-weight chart. On October 3, 1986, Cremeens opted for the body-fat method. Cremeens's maximum allowable weight, taking his uniform into account, calculated using the body-fat method increased to 231 pounds.
On August 21, 1989, Cremeens resigned from the fire department. Cremeens stated no reason for his resignation in his letter to the Montgomery Fire Department.
On January 18, 1990, Cremeens asked Deputy Chief Fulmer to rehire him as a firefighter. Cremeens was not a member of Local 1444 when he asked to be rehired, and union membership was not discussed during Cremeens's meeting with Fulmer. Cremeens was found to be physically fit for the performance of the duties of a firefighter, and Chief Grier rehired him in March or April 1991. Cremeens was told when he was rehired that he would have to comply with the Department's weight policy, and Cremeens agreed to do so. Cremeens continued his bodybuilding, and he subsequently rejoined Local 1444.
Cremeens asked that he be permitted to use the body-fat method for his weigh-ins, and in September 1991 he asked for a body-fat evaluation. On September 17, 1991, District Chief Hill was notified that Cremeens's maximum allowable weight under the body-fat method was 244 pounds. (C. 217.) On January 28, 1992, Cremeens was weighed at Auburn University at *Page 1194 
Montgomery ("AUM") using the body-fat method, and was found to weigh 242 pounds. Cremeens again asked to have his body-fat evaluated in March 1992. This time, Cremeens's maximum allowable weight was 248 pounds. (C. 220.)
In September 1991, Cremeens signed a petition supporting a candidate for mayor who was running against the then mayor of Montgomery, Emory Folmar. Cremeens was called into the fire chief's office. According to Chief Grier, the conversation at that meeting was as follows:
 "I said, `Mr. Cremeens, look what the mayor' — I done forgot what he was doing downtown that day, but I said, `Mr. Cremeens, I want you to look at this.' I said, `Here I am, I went up there and stuck my neck out to get your job back for you and this is what I get down in the hand mail where you signed a petition for somebody to run against the mayor for political office.' I said `Son, you don't need to be doing that.' And that was all I said."
(C. 314.) When asked if he thought these comments were appropriate, Chief Grier explained that he "wasn't trying to tell [Cremeens] who to vote for or what to do, I was just giving him some advice."
Cremeens was involved in fund-raising for Local 1444 at the time of this meeting, but according to Cremeens, the City forced him to stop these efforts. Also, Cremeens wrote a letter on behalf of Local 1444 stating that firefighters should be treated the same as policemen were treated in that they, too, should be given compensatory time off for time spent giving blood.
Cremeens's first weight violation after he returned to the fire department in 1991 occurred on November 4, 1992. Cremeens was weighed, using the body-fat method, and was found to be three pounds over his maximum allowable weight of 248 pounds. Cremeens was suspended for five calendar days without pay for this violation (C. 222.) He did not appeal the suspension. Chief Grier informed Mayor Folmar of Cremeens's suspension by a memorandum dated November 13, 1992. Grier's memorandum noted that the present suspension was the first step in a three-step disciplinary process for firefighters "who are habitually overweight." (C. 229.)
On August 4, 1993, Chief Grier sent a memorandum to all fire department personnel, reminding employees of the rank of lieutenant or above that they could not "belong to, affiliate with, and/or provide support to Local 1444 or any other labor union or labor organization or such similar association or organization, which has as its members rank and file Firefighters and/or Sergeants of the Montgomery Fire Department." (C.R. Exhibit 27.)
On September 3, 1993, Cremeens was again determined to be overweight. Cremeens's maximum allowable weight at this time was 248 pounds; his actual weight was 253 1/2 pounds. (C. 231.) Cremeens was suspended for 15 days, and he did not appeal the suspension. Deputy Chief Fulmer sent a memorandum to Chief Grier informing Grier of Cremeens's latest violation of the weight policy and of Cremeens's suspension.
On November 23, 1993, Cremeens was sent to AUM to have his weight reevaluated by Dr. Hank Williford, using the body-fat method. Cremeens's percentage of body fat at this time resulted in his being "overfat." Overfat exists when a person's body fat exceeds 20 percent for men 29 years old or younger or exceeds 24 percent for men 30 years old and older. When body fat exceeds the maximum allowable body-fat percentage, established by age, a maximum allowable weight cannot be established. (C. 180; 294.) Because Cremeens was considered "overfat" based on the body-fat calculation, he was again suspended for 15 days, this suspension beginning on December 3, 1993. After this third suspension, Cremeens was again given a 30-day grace period to get his weight within permissible limits. In January 1994, Cremeens was again sent to Dr. *Page 1195 
Williford for an evaluation of his body fat. Based on this evaluation, Dr. Williford determined that Cremeens's maximum allowable weight, taking his uniform into account, was 237 pounds.[2] At that time, Cremeens was the president of Local 1444 and had again begun fund-raising on behalf of Local 1444; he contends that this was the reason his maximum allowable weight was decreased. In response, the City points out that Dr. Williford devised the mechanics for the body-fat measurement and that Dr. Williford, not Deputy Chief Fulmer, calculated the percentage of a firefighter's body fat, on which the determination of his or her "maximum allowable weight" was based.
Chief Hadden, Cremeens's district chief, weighed Cremeens at his monthly weigh-in on June 6, 1994. The other men in the station had been weighed during the earlier shift, but Cremeens was on leave during that shift. When Cremeens returned for duty on the following shift he was sent on detail to Station 12, where Chief Hadden weighed him. Cremeens weighed 240 pounds, three pounds over his maximum allowable weight. This was Cremeens's third violation of the weight policy within a 12-month period. Therefore, in accordance with the sanctions in the department's manual, Deputy Chief Fulmer recommended to Chief Grier that Cremeens be dismissed. On June 9, 1994, Cremeens was given a hearing before Chief Deputy Fulmer. Cremeens did not present any evidence or make any statements at the hearing. Because Cremeens had been found to exceed his maximum allowable weight 3 times within a 12-month period, Fulmer concluded that he had to recommend to Mayor Folmar that Cremeens be dismissed from the Montgomery Fire Department. In addition to the hearing before Deputy Chief Fulmer, Cremeens was also entitled to a hearing before James Buckalew, Mayor Folmar's administrative assistant. However, Cremeens refused to attend this hearing. The mayor is the City's appointing authority; as such, Mayor Folmar had the final authority on any termination within the Montgomery Fire Department. Mayor Folmar concurred in the decision to terminate Cremeens, and he was dismissed from the fire department.
Cremeens appealed his termination to the Montgomery City-County Personnel Board (the "personnel board"), which reviews personnel decisions made concerning city and county employees. At this stage Cremeens was afforded the following rights: the right to attend the personnel hearing unless he was excused by the personnel board; the right to be represented by counsel or by a representative of his choice; the right to subpoena a witness if done timely; the right to cross-examine and to impeach all witnesses appearing against him; the right to present affidavits, exhibits, and other evidence the personnel board deemed pertinent to the inquiry; and the right to argue his case.
Cremeens did not testify during the personnel board hearing, and he did not present any evidence. Cremeens did briefly question members of the personnel board, and he answered some of the questions submitted to him by the personnel board. Cremeens commented on the Montgomery Fire Department's weight policy, and he argued that the body-fat test, as it was written, was not fair. The issues that Cremeens raised during the personnel board's hearing were limited to the Montgomery Fire Department's weight policy. He did not touch upon any issues involving Local 1444, including the freedom-of-speech and the freedom-of-association claims he later raised. *Page 1196 
On July 15, 1994, the personnel board advised Cremeens that it was upholding the City's decision to terminate his employment with the Montgomery Fire Department.
Cremeens contends that because of his membership in Local 1444, the weight policy was applied inequitably, and that this inequitable application resulted in his termination. Cremeens presented evidence indicating that Chief Grier had exceeded the weight limit on several occasions but that he had never been disciplined. There was also evidence indicating that Chief Grier would not weigh certain firefighters on days when he believed they would be over their maximum allowable weight. For example, Firefighter James Conner testified that he was often told in advance on which day the firefighters would be weighed so that he could lose weight before weigh day. (C.R. 400-01.) Firefighter Anthony Perkins testified that he was told one month that the fire department would not be weighing that month because a certain firefighter was overweight. (C.R. 427-28.) Firefighter Ron Howard was allowed to weigh without his shoes so that he would come within the maximum allowable weight. Cremeens argues that the real reason for his termination was his involvement with Local 1444 and not his violation of the department's weight policy.
On February 20, 1996, Cremeens sued the City and Chief Grier and Deputy Chief Fulmer, in their official and individual capacities, under 42 U.S.C. § 1983, alleging that they had violated his freedom of speech; his freedom of association; and his right to equal protection. Cremeens contends that the City, acting through Chief Grier, Deputy Chief Fulmer and Mayor Folmar, had a pervasive custom and practice of threatening, coercing, and intimidating firefighters to keep them from joining Local 1444. In a seven-count complaint, that he amended three times, Cremeens states the following claims:
 Count I: The defendants violated Ala. Code, § 21-7-8, because, he says, they caused his suspension and subsequent termination due to a perceived disability (i.e., his weight).
 Count II: The defendants violated 42 U.S.C. § 12111, the Americans with Disabilities Act, because, he says, they caused his suspension and subsequent termination due to a perceived disability (i.e., his weight).
 Count III: By targeting Cremeens for termination, the defendants violated his freedom of speech, freedom of association, and freedom of political affiliation, which are guaranteed him under the First and Fourteenth Amendments to the United States Constitution and the Alabama Constitution of 1901. Cremeens further alleges that the defendants' actions with respect to this Count were intentional and/or wanton.
 Count IV: The defendants' conduct violated Cremeens's right of equal protection under law, guaranteed him by the Equal Protection Clause of the Fourteenth Amendment and the Alabama Constitution of 1901 and thereby deprived him of his career, wages, benefits, etc. Cremeens further alleges that the defendants' actions with respect to this Count were intentional and/or wanton.
 Count V: The defendants wrongfully terminated Cremeens without cause and in clear violation of Ala. Code 1975, §§ 25-7-30, -31, -33, and -35. Cremeens further alleges that the defendants' actions with respect to this Count were intentional and/or wanton.
 Count VI: The defendants wrongfully threatened, harassed, and retaliated against Cremeens by disciplining and terminating him because of his union activity, his union membership, and his political affiliation, in violation of Ala. Code 1975, §§ 25-7-30, -31, -33, -35 and/or -36; Ala. Code 1975, § 25-7-9; and Ala. Code 1975, § 11-43-143. Cremeens further alleges that the defendants' actions with respect to this Count were intentional and/or wanton. *Page 1197 
 Count VII: The defendants colluded or conspired together in each of the above Counts by disciplining and terminating him because of his union activity, his union membership, and his political affiliation, in violation of Ala. Code 1975, §§ 25-7-30, -31, -33, -35 and/or -36; Ala. Code 1975, § 25-7-9; and Ala. Code 1975, § 11-43-143. Cremeens further alleges that the defendants' actions with respect to this Count were intentional and/or wanton.[3]
The trial court dismissed Counts I and II, which claim that Cremeens was terminated because of a perceived disability, and those claims were not argued in the trial court. On May 5, 1998, the trial court entered a summary judgment in favor of the City as to all of Cremeens's remaining claims. The trial court entered a partial summary judgment in favor of Grier and Fulmer as to Cremeens's freedom-of-speech claim. The trial court denied the summary-judgment motion as to the remaining claims against Grier and Fulmer in their individual capacities, and held that they were not entitled to qualified immunity. Cremeens appeals only from the summary judgment in favor of the City. We affirm.
42 U.S.C. § 1983 provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. . . ."
A municipality may not be held liable under 42 U.S.C. § 1983
on a theory of respondeat superior. Monell v. Department of SocialServs. of the City of New York, 436 U.S. 658, 691 (1978); Scala v.City of Winter Park, 116 F.3d 1396, 1399 (11th Cir. 1997). "Instead, municipalities may only be held liable for the execution of a governmental policy or custom." Id. See Monell,436 U.S. at 694. Stated differently, a municipality may be held liable under § 1983 only if "`action pursuant to official municipal policy of some nature caused a constitutional tort.'" Jett v. Dallas Indep.School Dist., 491 U.S. 701, 709 (1989) (quoting Monell,436 U.S. at 691). As the Monell Court explained, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694. AccordMorro v. City of Birmingham, 117 F.3d 508 (11th Cir. 1997).
 "`[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal "policy" or "custom" that caused the plaintiff's injury.' Board of County Comm'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). `A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she *Page 1198 
could be said to be acting on behalf of the municipality. . . . A custom is a practice that is so settled and permanent that it takes on the force of law.' Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997), cert. denied, 522 U.S. 1075, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998). We have emphasized that:
 "`[t]o establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality.' Depew v. City of St. Mary's, 787 F.2d 1496, 1499 (11th Cir. 1986); see also Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994)."
Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999). Furthermore,
 "Locating a `policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality. Monell [v. Department of Social Servs. of the City of New York, 436 U.S. 658 (1978)], supra, at 694. Similarly, an act performed pursuant to a `custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. 436 U.S. at 690-91, (citing Adickes v. S.H. Kress Co., 398 U.S. 144, 167-168 (1970))."
Board of County Comm'rs of Bryan County, Oklahoma v. Brown,520 U.S. 397, 403-04 (1997).
"[O]nly those municipal officials who have `final policymaking authority' may by their actions subject the government to § 1983 liability." City of St. Louis v. Praprotnik,485 U.S. 112, 123 (1988) (plurality opinion) (citing Pembaur v.City of Cincinnati, 475 U.S. 469, 483 (1986)). See also Church v.City of Huntsville, 30 F.3d 1332, 1341 (11th Cir. 1994). However, as the United States Court of Appeals for the Eleventh Circuit observed in Scala:
 "As Manor Healthcare [Corp. v. Lomelo, 929 F.2d 633
(11th Cir. 1991)] and our other post-Praprotnik cases make plain, the principles espoused by a plurality of the Supreme Court in Praprotnik have become embedded in the binding precedents of this circuit. Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review.
 "Scala protests that the effect of this rule of law is to unfairly insulate municipalities from liability for the wrongful conduct of subordinate officials. . . . [W]e note that the rule of Praprotnik does not leave plaintiffs such as Scala without a remedy. One remedy is provided them by the very means of administrative review that serves to insulate municipalities from respondeat superior liability for the conduct of rogue subordinates. Another such remedy is an individual-capacity civil action brought against the subordinate officials themselves."
Id., 116 F.3d at 1401. (Emphasis added.) Cremeens argues that the question whether a municipal official has final policymaking authority is a question of fact to resolved by a jury. We disagree.
 "[I]n St. Louis v. Praprotnik, 485 U.S. 112
(1988), we attempted a clarification of tools a federal court should employ in determining where policymaking authority lies for purposes of § 1983. In Praprotnik, the plurality reaffirmed the teachings of our prior cases to the effect *Page 1199 
that `whether a particular official has "final policymaking authority" is a question of state law.' Id., at 123 (emphasis in original), quoting Pembaur, 475 U.S., at 483 (plurality opinion). As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as `"custom or usage" having the force of law,' Praprotnik, supra, at 124, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see Monell, 436 U.S., at 661, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the `standard operating procedure' of the local governmental entity. See Pembaur, supra, at 485-487 (White, J., concurring)."
Jett, 491 U.S. at 737 (Some emphasis original; some emphasis added.)
Cremeens argues in his brief to this Court that the record reflects that Chief Grier had a custom, policy, and practice of discriminating and retaliating against members of Local 1444, and specifically against Cremeens, as the president of Local 1444, and that it further reflects the City of Montgomery's acquiescence in, and support of, Grier's actions. Cremeens further argues that he has established, by substantial evidence, that the City violated his civil rights under 42 U.S.C. § 1983, when it terminated his employment with the Montgomery Fire Department. Therefore, Cremeens argues, the trial court erred in granting the City's motion for a summary judgment as to his § 1983 claim. Cremeens also argues that the trial court's finding, as a matter of law, that Chief Grier was not the final decision-maker with the respect to the employment practices of the Montgomery Fire Department is not supported by the record. For this reason, Cremeens asserts that the court's summary judgment as to his § 1983 claim was improper. These arguments are without merit.
While Cremeens's submission filed in opposition to the City's summary-judgment motion, viewed in the light most favorable to Cremeens, the nonmovant, demonstrates that the City, through the actions of Chief Grier, Deputy Chief Fulmer, and then Mayor Folmar had a pervasive custom and practice of threatening, coercing, and intimidating firefighters to keep them from joining Local 1444, there is little in the record indicating that the personnel board knew about, acquiesced in, or ratified those practices. Stated differently, without also establishing that the personnel board knew of such custom and practice, the fact that Cremeens established a retaliatory custom and practice on the part of the City, through the actions of Chief Grier, Deputy Chief Fulmer, and Mayor Folmar, is insufficient to defeat the City's summary-judgment motion. Thus, the fact that Cremeens did not touch upon the custom and practice of Chief Grier, Deputy Chief Fulmer, and Mayor Folmar as to members of Local 1444 during his hearing before the personnel board is significant in determining whether Cremeens established by substantial evidence that the personnel board knew or was aware of the actions of Chief Grier, Deputy Chief Fulmer, and Mayor Folmar toward members of Local 1444. *Page 1200 
Here, the personnel board's action demonstrates the existence of a meaningful administrative review that, under Scala, deprives Chief Grier and thus the City of "final policymaking authority." If Cremeens wanted to challenge the findings of the personnel board on the ground that the board is merely a "rubber stamp" for the actions of Grier and the City, he must present substantial evidence to that effect in opposition to the City's properly supported summary-judgment motion. Scala, 116 F.3d at 1402.
This Court is unwilling to conclude that the absence of written findings by the personnel board is substantial evidence of "rubber stamping."[4] We acknowledge that Cremeens's burden is not a light one. See Vincent v. City of Talladega,980 F. Supp. 410, 417 (N.D.Ala. 1997) (wherein the court criticizes Scala
on the basis that proof of a proscribed motive for a deliberative decision may be difficult). An inference to be drawn from the absence of findings of fact in the personnel board's letter to Cremeens is not substantial evidence that would generate a basis upon which to defeat a properly supported summary-judgment motion.
The rule of law in Scala provides that a municipality is not liable for a claim under 42 U.S.C. § 1983 when final policymaking authority over a particular subject area does not vest in an official whose decisions are subject to meaningful administrative review. Id., 116 F.3d at 1401. Here, the personnel board upheld Cremeens's termination. Cremeens attempts, in his brief to this Court, to denigrate the role of the personnel board by asserting that "[t]here is no evidence of the decision-making process of the personnel board. The only document supporting the personnel board's decision is the letter informing Mr. Cremeens that the board `upheld' the Chief's decision to terminate him." (Cremeens's Reply Brief at p. 18).
Because the record contains no evidence that the personnel board was aware of, acquiesced in, or ratified the custom and practice of Chief Grier, Deputy Chief Fulmer, and Mayor Folmar toward members of Local 1444, Cremeens has failed to present substantial evidence that would create a genuine issue of material fact and thus provide a basis on which to deny the summary-judgment motion. Accordingly, the City's summary judgment as to Cremeens's § 1983 claim is due to be affirmed.
We also affirm the City's summary judgment as to Cremeens's freedom-of-speech claim. The record reflects that Cremeens filed his initial complaint on February 20, 1996. Thereafter, Cremeens filed three amended complaints. Count III of his third amended complaint alleges that the City "targeted [him] for termination" in violation of his right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution and the Alabama Constitution of 1901. Cremeens's freedom-of-speech claim against the City is based on his allegations that two of the City's employees, Chief Grier and Deputy Chief Fulmer, threatened, intimidated, and harassed him, and that they otherwise interfered with his freedom of speech.
As the City points out in its brief to this Court, the trial court on May 5, 1998, entered a summary judgment in favor of Grier and Fulmer as to Cremeens's freedom-of-speech claim. The City also points out that Cremeens failed to appeal from the summary judgment in favor of Grier and Fulmer as to the that claim. Furthermore, a review of the notice of appeal and the docketing statement filed by Cremeens convinces us that Grier *Page 1201 
and Fulmer have not been made parties to this appeal. (C. 593; 594.) Therefore, the City argues that any claim that the City, through the conduct of Grier and Fulmer, violated Cremeens's right to freedom of speech has been waived. Based upon the particular facts of this case, we agree. Therefore, that part of the trial court's summary judgment in favor of the City on Cremeens's freedom-of-speech claim is also due to be affirmed.
Cremeens raises several other claims against the City. Cremeens alleges that the conduct of the defendants that forms the basis of the allegations in the remaining counts (Counts III through VII) was intentional and/or wanton. Thus, whether by pleading or by implication, the claims in Counts III through VII alleges intentional torts. A municipality cannot be held liable for the intentional torts of its employees. See Ala. Code 1975, §11-47-190; Gore v. City of Hoover, 559 So.2d 163 (Ala. 1990). Therefore, the trial court's summary judgment in favor of the City must also be affirmed as to Counts III through VII.
For the foregoing reasons, the trial court's summary judgment in favor of the City of Montgomery is due to be affirmed.
AFFIRMED.
Hooper, C.J., and Maddox, Houston, Cook, See, Lyons, Brown, Johnstone, and England, JJ., concur.
[1] Cremeens does not appeal from the partial summary judgment entered in favor of Fire Chief R.W. Grier and Deputy Fire Chief J.L. Fulmer.
[2] A firefighters' uniform weighs approximately six pounds. After a firefighter's weight has been determined using the body-fat evaluation, six pounds are added to the firefighter's weight, to account for the clothing he will be wearing when he is weighed at his station. The firefighter's weight, after the weight of his clothing has been added, is the "maximum allowable weight."
[3] Sections 25-7-9, and 25-7-30, -31, -33, -35, and -36, Ala. Code 1975, and Ala. Code 1975, § 11-43-143, all pertain to the right to join, or to not join, a labor union or a labor organization.
[4] We have noted that Cremeens's civil rights claims under42 U.S.C. § 1983, are based, to a large extent, on the absence of written findings of fact in the Montgomery City and County Personnel Board's letter notifying him of his termination. Cremeens argues that this absence of findings indicates a lack of meaningful review. Cremeens included, as Exhibit 2 of his motion for reconsideration of the summary judgment entered in the City's favor, portions of the Board's manual entitled "Procedure For Conducting Hearings." Page 44 of this manual states that "[f]ormal findings of fact are not required." (Emphasis added.)