[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 6, 2006
THOMAS  K. KAHN
CLERK

_____

No. 04-11409

_____

D. C. Docket No. 00-02080-CV-C-M

JOSEPH R. CAMPBELL,
MARILYN CAMPBELL,

Plaintiffs-Appellees,

versus

RAINBOW CITY, ALABAMA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(January 6, 2006)**

Before CARNES and PRYOR, Circuit Judges, and FORRESTER[*], District Judge.

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of
Georgia, sitting by designation.

FORRESTER, District Judge:

Plaintiffs, Joseph and Marilyn Campbell, brought this action pursuant to 42 U.S.C. § 1983 in the United States District Court for the Northern District of Alabama against Defendant Rainbow City (hereinafter "Defendant" or "the City"), its mayor and its Board of Adjustment, seeking damages allegedly resulting from the City Council and Planning Commission's denial of tentative approval for Plaintiffs' proposed building project.[1] Plaintiffs contend that the City violated their rights under the First Amendment and the Fourteenth Amendment's Equal Protection Clause when it denied them such tentative approval. Plaintiffs claim that all other developers that came before the Planning Commission had received approval and aver that Plaintiffs were treated differently by the City because of Mr. Campbell's candidacy in a prior mayoral election, in which he ran against the incumbent mayor, a member of the Planning Commission that refused to give tentative approval. The case went to trial, and the jury returned a verdict for Plaintiffs.

---

[1]On March 9, 2001, Plaintiffs, represented by new counsel, filed a second amended complaint in which only the municipality of Rainbow City was named as a Defendant. Thereafter, the mayor and the Board of Adjustment were no longer parties to the litigation.

Defendant Rainbow City has appealed, asserting as error the district court's denial of Defendant's Rule 50 motion for judgment as a matter of law.[2] We agree for two reasons. Plaintiffs failed as a matter of law to show that the City's final policymaker acted with an unconstitutional motive, and thus no reasonable jury could find that the City violated the Plaintiffs' First Amendment rights. Moreover, Plaintiffs have not offered any evidence to support an equal protection claim of similarly-situated individuals who were treated differently. Thus, the district court should have granted the City's Rule 50 motion. For these reasons, the order of the district court is reversed, and it is directed to enter judgment for Defendant.

## I.    Background

In 1996, Mr. Campbell ran for the office of Mayor of Rainbow City and was defeated by the incumbent, Mayor Sue Glidewell. During his bid for office, Mr. Campbell was critical of Glidewell and her policies.

All building projects in Rainbow City must gain approval of the City Council and the Planning Commission. As part of her office, Mayor Glidewell is a voting member of both the City Council and the Planning Commission and appoints six of the other nine members to the Planning Commission. Prior to final

---

[2]Defendant also appeals the district court's ruling on several other grounds. Because we conclude that the district court should have granted the City's Rule 50 motion, we need not address Defendant's other arguments.

3

approval of a project, the Planning Commission can grant tentative approval if the applicant meets certain requirements. Tentative approval permits the developer to start preparing the site for construction by allowing cleaning and clearing of the land and some minor grading.[3]

The Rainbow City Zoning Ordinance has a set of specific regulations governing developments within Rainbow City. One such regulation affecting multifamily housing developments relates to density. Prior to 1999, the Ordinance allowed a density of ten units per acre. The Ordinance was amended in 1999 to allow a density of sixteen units per acre.

On May 5, 1997, the Campbells bought approximately ten acres of land within Rainbow City.[4] The property was zoned for multifamily housing. Plaintiffs wanted to build a large apartment complex on the tract of land. Originally, the Campbells intended to build 180 units on the property. In order to develop the property in this manner, Plaintiffs would need to obtain a variance because the pre-1999 Ordinance would permit only 100 units on a ten-acre tract of

---

[3] The city building inspector developed the concept of tentative approval and its requirements. The City grants or denies tentative approval if it is sought by a developer, but the City has never officially required that it be obtained.

[4] Although the parties repeatedly refer to Plaintiffs' property as "ten acres," after the original purchase of the land, the Campbells sold 1.17 acres. Thus, the acreage is less than nine acres, rendering the density figures given by the parties too low. Nevertheless, because our analysis does not change whether the acreage is nine or ten, we will continue to refer to the land as ten acres.

land.  In January 1998, Mr. Campbell met with Mayor Glidewell to discuss the construction of an apartment complex on the property.  Later, on February 20, when Mr. Campbell came before the City's Planning Commission, he sought to develop 162 apartments on the land.  He brought a vicinity map, which highlighted the property, to the meeting.  The Planning Commission decided to table the matter for discussion.

On March 23 and 24, 1998, Mr. Campbell attended a City Council meeting and a Planning Commission meeting to determine if he would be permitted to build 162 apartments on the land.  Both the Council and the Planning Commission tabled the matter for further discussion.

On April 28, 1998, Mr. Campbell again went before the Planning Commission.  This time he stated that he was seeking to build one building with 16 units on part of the property.  Mr. Campbell believed that if he impressed the Planning Commission with this development, it would allow him to build the other apartments.  The Planning Commission, wary of Mr. Campbell's request, tabled any action until it could consult with the City's attorney.

In May 1998, Mr. Campbell hired an attorney to help him with his requests.  On May 11, 1998, Mr. Campbell attended a City Council meeting and left paperwork with the Council.  In a letter addressed to the Mayor on the same date,

5

Plaintiffs stated their reasons for seeking a variance from the limitation of ten units per acre.

On June 8, 1998, the Campbells sent another letter to the Mayor and the City Council. The Campbells indicated in the letter that the City lawyer had informed them that they had not complied with the requirements of tentative approval and the letter was an attempt to demonstrate compliance.[5] The Campbells stated that they were seeking tentative approval for twenty-two apartments per acre on their ten-acre tract. Attached to the letter was a sketch drawn in pencil showing the locations of the proposed buildings.

The next correspondence between the parties appears to have taken place more than one year later. After an inquiry from the Campbells' attorney, on October 8, 1999, the City's attorney stated that the Campbells had never satisfied the fifth requirement for tentative approval.

Under the structure set up by the City, parties dissatisfied with the Planning Commission's response may appeal to the Board of Adjustment. On November 5,

---

[5] There is some dispute about whether there were four or five requirements for tentative approval. Plaintiffs submitted one document from the Rainbow City Planning Commission stating the requirements for tentative approval were: (1) name, address, and phone number of the property owner, (2) the address of the property under consideration, (3) a sketch of the property with building locations, and (4) zoning and land use information. The document attached to the Plaintiffs' June 8 letter, however, contained another additional requirement: (5) approval subject to plans and specifications and after review by building, fire, and engineering departments. This dispute is not relevant to our analysis.

1999, the Campbells filed an application with the Board of Adjustment in which they sought a number of variances. Plaintiffs sought a variance with regard to apartment density, so as to allow them to build twenty-one units per acre as opposed to sixteen, the maximum that the Ordinance would have allowed at that time. They also sought a variance from the setback requirement for buildings, which required a setback of fifteen feet from parking areas. They sought a variance from the requirement for the mandatory spacing between buildings. Finally, Plaintiffs asked for a variance from the mandatory front and back yard space requirements. The Board of Adjustment, which met in May 2000, turned down all of Plaintiffs' requests for variances. Eventually, Plaintiffs sold half of the property. Another party developed that portion of the property under the name Meadow Oaks.

Plaintiffs offer the following developments as comparators: the Etowah Steelworkers Credit Union, the Wallace Medical Center, Regency Point, St. Christopher Apartments, the Hidden Creek Apartments, Meadow Oaks, Terry Echols' apartments on Brown Avenue, and Terry Echols' apartments on Sixth Street.

The Etowah Steelworkers Credit Union and the Wallace Medical Center are commercial developments. Regency Point was built in 2000 as a Planned Unit

Development for a mixed-use retirement community. There is no evidence in the record to show that Regency Point sought or obtained tentative approval from the Planning Commission to develop the property. The area was rezoned without the developer furnishing the City with a zoning request or a concept plan. According to Plaintiffs' expert, Mr. Stinson, Regency Point does not have the mix of commercial and residential housing required by the Ordinances relating to a Planned Unit Development.

The St. Christopher apartment complex was built partially on land zoned for R-1 property, a designation which does not allow the building of apartments. Mr. Stinson could find no record of plans having been submitted to the City's building department.

The Hidden Creek Apartment complex is a small, sixteen-unit development situated on a half-acre near Plaintiffs' tract of land. There is no evidence in the record to show that the developers of the Hidden Creek Apartments sought or received tentative approval for the development prior to receiving final approval. According to Mr. Stinson, the Hidden Creek Apartments do not comply with the City Ordinances governing density, parking, and recreational areas.

The Meadow Oaks development, a fifty-six-unit multifamily apartment complex, built on land originally owned by Plaintiffs, was granted tentative

approval by the Planning Commission after its developers submitted a site plan. The development as built does not have the proper buffer zone between the development and an adjacent single family residence.

Finally, Plaintiffs claim their project to be similarly situated to the two sets of apartments built by Terry Echols: an eight-unit complex on Brown Avenue and a ten-unit complex on Sixth Street, both of which do not comport with the City Ordinance in numerous ways. Both Echols' developments sought and received tentative approval from the Planning Commission. Each time Mr. Echols came before the Commission, he brought site plans outlining the proposed locations of the buildings. On a few occasions he was accompanied by both his architect and his engineer who would answer questions posed by the Planning Commission relating to the proposed development.

Mr. Echols appeared before that Planning Commission six or seven times prior to receiving tentative approval for his development on Sixth Street. For his Brown Street development, Mr. Echols attended at least two meetings prior to getting tentative approval. Each time that he was not granted tentative approval, the Planning Commission would table the matter for further discussion, and he was expected to return to seek approval at the next meeting.

At trial, Plaintiffs supported their argument that they were treated differently and retaliated against by the City with the testimony of the City's former Building Inspector, Jack Bowlings. Although Mr. Bowlings was not present at trial because he was deceased, he had given sworn testimony at three pretrial depositions. Moreover, prior to the third deposition, he had submitted a sworn affidavit to the parties. Plaintiffs contend that the statements in the depositions and the affidavit prove that they were treated unjustly by the City. Defendant argues that the testimony of Mr. Bowlings is inadmissable, a position with which we find some sympathy. However, because we decide the case on other grounds, we need not further address Mr. Bowlings' testimony. Similarly, we do not address Defendant's appealing argument that the expert testimony relied on to support the award of damages is inadmissible.

## II.    Discussion

After the conclusion of Plaintiffs' case and at the end of trial, the City made Rule 50 motions for judgment as a matter of law. The trial court denied these motions. Defendant appeals this denial.

We review a Rule 50 motion for judgment as a matter of law *de novo*, applying the same standards used by the district court. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (per curiam). We consider "whether sufficient

10

conflict exists in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that that party is entitled to succeed in his or her own position as a matter of law." *Id.* "Although we look at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Id.* Because the jury found for Plaintiffs on both the First Amendment claim and the equal protection claim, Defendant must show that the trial court erred in sending both claims to the jury.

## A.     Section 1983 Claims

A "local government 'may only be held liable under Section 1983 if action pursuant to official . . . policy of some nature caused a constitutional tort." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (per curiam) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)). Further, only municipal officers or groups who have final policymaking authority may subject the municipality to § 1983 liability. *Id.*

## B.     First Amendment

We assume, for the purposes of appeal, that Plaintiffs' speech is protected by the First Amendment. We also assume that Plaintiffs produced evidence from which a reasonable jury could have found that Mayor Glidewell sought to punish

Plaintiffs in retaliation for their protected speech. In order to find that the City is liable for such an alleged tort, however, we must find that the Planning Commission, the final policy maker, acted with the improper motive. *Matthews*, 294 F.3d at 1297. An improper motive of one of the members of a nine-member Planning Commission is not imputed to the rest of the Commission. *Id.* (unconstitutional motive of one member of a three-member majority is insufficient to impute an unconstitutional motive to a commission); *Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001) (summary judgment for municipality appropriate where plaintiff showed evidence of discriminatory motive held by one member of a three-person majority).

In *Matthews,* the plaintiff alleged that her job as the County's Director of Administrative Services was eliminated in retaliation for her statements concerning a company with which the County was attempting to contract. Three of five county commissioners voted to eliminate the position. In a special verdict, a jury determined that one of the commissioners was motivated to eliminate the position by the plaintiff's protected speech and that the two other commissioners were "influenced" by that commissioner. We held, however, that the plaintiff's evidence did not support a finding of unconstitutional motive on behalf of the County Commission on the basis either of a theory of delegation or ratification.

12

*Matthews*, 294 F.3d at 1297.  We found that a delegation theory applies only where a group with final policymaking authority delegates its authority to another person or entity, and that person or entity is not subject to any review by the original policymaker.  *Id.* (citing *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)).  We also found that in order for a municipality to be liable under a ratification theory, the final policymaker must ratify not only the decision of its member with an unconstitutional motive, but also the unconstitutional basis itself.  *Id.* (citing *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998)).

Here, as in *Matthews*, the evidence fails to show that the Planning Commission, the policymaker for the City, acted with an unconstitutional motive in denying Plaintiffs "tentative approval" for their building project.  The only evidence that Plaintiffs offered into evidence were the opinions of Mr. Bowlings that Mayor Glidewell influenced and controlled the Planning Commission; there is not a scintilla of evidence that the Commission knew of and ratified an unconstitutional motive in its decision to repeatedly table Plaintiffs' request for tentative approval of their project.  Without any evidence showing that a majority of the members of the final policymaker, the Planning Commission, acted with an unconstitutional motive, the trial judge erred in denying Defendant's Rule 50 motion with respect to the Plaintiffs' First Amendment Claim.

13

## C.    Equal Protection

As a preliminary consideration, federal courts should be disinclined to "sit as a zoning board of review," and as a "general rule," zoning decisions "will not usually be found by a federal court to implicate constitutional guarantees." *Greenbriar Village, L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1262 (11th Cir. 2003) (per curiam).  Nevertheless, the Equal Protection Clause requires government entities to treat similarly situated people alike.  Equal protection claims are not limited to individuals discriminated against based on their membership in a vulnerable class.  Rather, we have recognized any individual's right to be free from intentional discrimination at the hands of government officials.  *See, e.g., E & T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir. 1987).  To prevail on this traditional type of equal protection claim, basically a selective enforcement claim, that the City's Ordinance was applied to them, and not other developments, Plaintiffs must show (1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs. *See Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996).

Plaintiffs' equal protection claim and the court's jury instruction thereon seem to mirror a newer trend in equal protection law, "a class of one claim"

14

without a necessary showing of ill will or discriminatory purpose. The Supreme Court has recognized the Equal Protection Clause is implicated in "class of one" claims "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).[6]

The analysis of Plaintiffs' equal protection claim requires a finding that there were developments which were similarly situated to the Campbells' proposed development, because "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *E & T Realty*, 830 F.2d at 1109. A showing that two projects were similarly situated requires some specificity. *Strickland v. Alderman*, 74 F.3d at 264-65; *Racine Charter One, Inc. v. Racine Unified School Dist.*, 424 F.3d 677, 680 (7th Cir. 2005) (finding that "[t]o be considered 'similarly situated,' comparators must be *prima facie* identical in all relevant respects") (internal citations and quotations omitted). In the zoning

---

[6] Some circuits have read *Olech* to still require ill will on the part of the defendant. *See, e.g. Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 454 (7th Cir. 2002). Other circuits following *Olech* have found that a plaintiff can also bring a successful equal protection claim merely by "negativing every conceivable basis which might support" the government action. *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005) (quotation and citation omitted). Without deciding whether illegal animus is required to show a equal protection violation, we find that the Campbells have not satisfied either test.

15

context, projects which seek different types of variances are not similarly situated. *See Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455-56 (7th Cir. 2002).

Here, the district court in its jury instructions correctly specified the first step in determining if Plaintiffs' evidence supported an equal protection violation when it required the jury to find that the City treated Plaintiffs "differently from similarly situated landowners who sought tentative approval of apartment building plans." However, the district court erred in denying Defendant's Rule 50 motion because Plaintiffs failed to provide the jury with sufficient evidence from which it reasonably could have determined that any of the comparators offered by Plaintiffs were similarly situated to the Plaintiffs' development.

Applying the logic in *Racine*, in order for any development to be similarly situated to Plaintiffs' proposed project, it must be *prima facie* identical in all relevant respects. In any type of zoning situation, the use of the proposed development is quite relevant. The district court correctly recognized the importance of use in its equal protection charge to the jury which directed that only developers who sought approval of *apartment* building plans could be considered similarly situated. Because the Campbells sought to build a large residential complex, it would be in error for the court to consider commercial developments that sought tentative approval to be considered similarly situated to

16

the Campbells' project. This obvious conclusion eliminates both the Etowah Steelworkers Credit Union and the Wallace Medical Center.

Next, because Plaintiffs are asserting that their damages were the result of the Planning Commission's denial of tentative approval for their project, for a project to be *prima facie* identical to Plaintiffs' development in all relevant respects, Plaintiffs must have shown that the other development sought and received tentative approval of its site from the City. Without a showing that a development sought and received tentative approval, a jury could not conclude that the development was similarly situated to Plaintiffs' development, nor could a jury conclude that the parties were treated differently. With regard to three of the developments that the Plaintiffs contend were similarly situated, Plaintiffs did not provide sufficient evidence showing that the developments sought and obtained tentative approval.

Plaintiffs went to great lengths to show that the area on which the Regency Park development was to be built had been rezoned without the proper documentation.[7] However, Plaintiffs did not show that the Regency Park development ever sought and was granted tentative approval. As stated above, for

---

[7] The Planning Commission rezoned the land on which the Regency Park development was built as a Planned Unit Development without requiring application or concept plan. Furthermore, Plaintiffs point out that the intent of a Planned Unit Development is a mixed-use development and that the Regency Point development has only residential housing.

17

a development to be similarly situated, it must have sought tentative approval. Because the two projects sought different action from the Planning Commission, we cannot find that the developments were similarly situated. We find such evidence also lacking with respect to the St. Christopher Apartments.

Moreover, for a reasonable jury to find the development to be similarly situated to Plaintiffs' development, Plaintiffs would need to provide a record of what the developer had brought before the Planning Commission when it was granted tentative approval. Without such information, neither a jury nor the court would be able to determine whether the Planning Commission had a rational reason for the different treatment. Because Plaintiffs provided no such information, no reasonable jury could find the St. Christopher Apartments to be similarly situated to Plaintiffs' development so as to warrant a finding of an equal protection violation.

Plaintiffs point to the Hidden Creek development as a similarly situated development that received treatment different from Plaintiffs' proposed development. Plaintiffs contend that this treatment was without a rational basis. While Plaintiffs have provided abundant evidence regarding the various violations of zoning ordinances by the Hidden Creek development, again, as in the case of the St. Christopher Apartments, Plaintiffs have not provided evidence showing

18

that the developer of the Hidden Creek development sought and received *tentative*

*approval* for the project. And even assuming that the Hidden Creek developer did

seek tentative approval, Plaintiffs did not submit evidence to show what

documentation the developer brought before the Planning Commission when it

was seeking tentative approval. As stated above, such evidence is mandatory for a

showing that the development was similarly situated to the Campbells' proposed

development for equal protection purposes.[8]

Unlike Regency Point, the St. Christopher Apartments, and Hidden Creek,

Plaintiffs have shown that some of the developments which Plaintiffs contend

were similarly situated, sought and received tentative approval. Nevertheless,

these developments do not justify sending the Plaintiffs' equal protection claim to

the jury.

Plaintiffs contend that Meadow Oaks was similarly situated to their

proposed development. They state that the City granted Meadow Oaks tentative

approval despite the development needing a variance from a buffer zone

requirement. However, the two developments cannot be considered similarly

---

[8] Moreover, the sixteen-unit Hidden Creek development can hardly be considered similarly situated to the Plaintiffs' 144 -180 unit project. The impact on a community of a sixteen-unit apartment complex that violates a zoning requirement is quite different from a 144 - 180 unit apartment complex. It is rational that a zoning board would be less likely to grant a variance to a development that would violate a zoning ordinance like the density requirement to a greater degree.

situated. While the land and the multifamily housing proposed use of these two developments were the same, Meadow Oaks did not require the same, or as many, variances as were sought with respect to Plaintiffs' proposed project.[9] The only alleged violation made in the Meadow Oaks development was a violation of a buffer zone requirement. As stated above, developments seeking different variances cannot be considered similarly situated. Moreover, prior to getting approval to develop the property, the developers of the Meadow Oaks development submitted a completed site map for 13.02 units per acre which met density requirements. Thus, the two developments were not similarly situated, and there were material differences which could provide rational reasons for the different treatment of the two developments.

The Campbells also point to Terry Echols' Apartments on Brown and Sixth Street as developments that were similarly situated to their development and that were treated differently with no rational basis. There is evidence that the developer of both of those apartment complexes came before the Planning Commission and was granted tentative approval. Campbell contends that the developments were constructed in violation of the City's density requirement. The

_____

[9] As noted above, Plaintiffs sought a variance with regard to apartment density so as to allow them to build twenty-one units per acre as opposed to sixteen. They sought variances from the setback requirement for buildings, from the requirement for the mandatory spacing between buildings, and from the mandatory front and back yard space requirements.

record, however, is silent on this point.[10]  Further, unlike the Campbells, Mr. Echols stated that every time he appeared before the Planning Commission, he brought along plans for the proposed development.  Sometimes he brought along an engineer and an architect to answer questions with respect to zoning requirements.

The City has always maintained that the Campbells did not comply with the requirements for tentative approval.  One of the requirements for parties seeking tentative approval (under either the four-requirement or five-requirement approach) is a sketch of the property with building locations.  The City contends that Plaintiffs did not provide an adequate sketch in all of their meetings with the Planning Commission and indicated that the sketch brought by Plaintiffs was drawn in pencil which would have allowed any of the proposed building locations to be changed easily.

There is no doubt that the developer of Echols' projects provided sketches – at every meeting the developers produced site plans and came with an architect and an engineer to explain the plans to the Commission.  Thus, even if the two developments were considered similarly situated  in that they both sought tentative

---

[10]  Plaintiffs cite to page 456 of the record.  Neither that page nor the surrounding pages mention the density of these units, and we are unaware of any other information in the record that supports this contention.

approval, there is no evidence that the Echols projects violated density requirements, and there was a rational basis for the different treatment that the two developments received. There is evidence that the two developments were not similarly situated in that Terry Echols' apartments on Brown and Sixth Streets are smaller than Plaintiffs' much grander design, comprising only ten and eight units, respectively, and the nature of the presentations Echols made would inspire more confidence than the Campbells' rather nonchalant approach.

Further, stating that Mr. Echols and the Campbells were treated differently is not entirely accurate. While the developer of the Echols developments was eventually granted tentative approval and the Campbells were not, the two parties' treatment by the Planning Commission was quite similar. Mr. Echols testified that for his development on Sixth Street he had to attend "six or seven" Planning Commission meetings prior to getting approval. In regard to his Brown Street development, Mr. Echols stated that he thought he attended more than two Planning Commission meetings. At those meetings in which he did not get approval, Mr. Echols was not denied tentative approval; rather, the board did not take action and tabled the matter for more discussion. Mr. Echols was required to come back to subsequent meetings and eventually the issues were resolved. This treatment of Mr. Echols is quite similar to the treatment that Plaintiffs received.

22

Thus, the evidence presented leads us to believe that the Campbells were treated similarly to another development that had come before the Planning Commission.

Because Plaintiffs have not given any evidence of Defendant's different treatment of a development that was similarly situated to their proposed development, they have not met their evidentiary burden in bringing a successful equal protection claim. Thus, the district court should have found that no reasonable jury could find for the Plaintiffs on this claim and should have granted Defendant's Rule 50 motion for judgment as a matter of law.

## III. Conclusion

Having found that Plaintiffs did not proffer sufficient evidence for a reasonable jury to find that the final policymaker acted with a discriminatory purpose against Plaintiffs in violation of their First Amendment rights, and having found that Plaintiffs did not proffer sufficient evidence for a jury to find that Plaintiffs were treated differently than similarly situated individuals in violation of the Equal Protection Clause, we find that the trial court erred in denying Defendant's Rule 50 motion for judgment as a matter of law. Thus, the opinion of the trial court is REVERSED, and the trial court is directed to enter judgment for the appellants.