**NEW CASTLE COUNTY, a political subdivision of the State of Delaware, Defendant Below, Appellant/Cross Appellee,**

v.

**WILMINGTON HOSPITALITY, LLC, Plaintiff Below, Appellee/Cross Appellant.**

No. 24, 2008.

Supreme Court of Delaware.

Submitted: Sept. 17, 2008.
Decided: Dec. 22, 2008.
Corrected: Dec. 22, 2008.

---

**55.** 42 U.S.C. § 672(a); *In re Burns,* 519 A.2d at 647.

**56.** 42 U.S.C. § 671(a)(15)(B)(ii).

**57.** Del.Code Ann. tit. 29, §§ 9003(3)-(5).

Peter J. Walsh, Jr., Esquire, (argued) and Sarah E. DiLuzio, Esquire of Potter Anderson & Corroon, LLP, Wilmington, DE; Of Counsel: Hamilton P. Fox, III, Esquire and Jay M. McDannell, Esquire of Sutherland Asbill & Brennan, LLP, Washington, DC, for Appellant/Cross Appellee.

Adam Balick, Esquire and Joseph S. Naylor, Esquire of Balick & Balick, LLC, Wilmington, DE; Of Counsel: John J. Yannacone (argued) of Yannacone & Associates, Media, PA, for Appellee/Cross Appellant.

Before BERGER, JACOBS and RIDGELY, Justices.

BERGER, Justice:

In this appeal we consider, among other matters, whether the Superior Court erred in deciding that a developer's equal protection claim presented triable issues of fact. The developer alleged that New Castle County arbitrarily treated the developer differently from other, similarly situated landowners by preventing the developer from opening its hotel. The record establishes that the hotel failed to comply with the applicable zoning codes, and that the Board of Adjustment denied the developer's request for nine variances. None of the other Board decisions relied upon by the developer to show disparate treatment were *prima facie* identical. Thus, the developer's equal protection claim fails at the threshold. In addition, the Board's decision, which was not challenged,[1] provides a rational basis for its denial of the developer's requested variances. As a result, there was no support for the developer's claim that it was treated arbitrarily. We also find no merit to the developer's due

---

1. The developer abandoned its appeal of the Board decision.

process and inverse condemnation claims. Accordingly, we reverse the judgment in favor of the developer, and affirm the Superior Court's dismissal of the developer's other claims.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 1990, a predecessor of Wilmington Hospitality, LLC, ("WH"), owned by Joseph L. Capano and Albert A. Vietri, obtained final plan approval for a hotel to be built at the intersection of I-95 and Airport Road in New Castle County. The Record Plan authorized construction of a 118,805 square foot hotel. WH hired an architect, who designed a 155,480 square foot hotel. Nothing more was done for several years, as market conditions were unfavorable. In June 1998, after another architect completed the plans, WH applied for a building permit for a 155,480 square foot hotel. A few weeks later, WH entered into a sewer agreement with the County that recited the hotel size as 118,805 square feet. The County issued a building permit and WH proceeded with construction.

In May 2000, as the hotel neared completion, WH requested an inspection by the County in order to obtain a certificate of occupancy ("CO"). The inspectors noticed that the parking configuration was not consistent with the Record Plan. They also determined, among other things, that: (i) the hotel was significantly larger than the size stated in the Record Plan; (ii) it included banquet halls, meeting rooms, and other facilities that would necessitate additional parking; and (iii) it included a kitchen area for which no building permit had been issued. On June 22, 2000, the County issued a violation notice to WH and revoked its building permit. The violation notice stated that WH had provided "false statements ... in the application and/or on the plans on which the permit or approval was based."

Over the next several months, WH tried to resolve the problems arising from the discrepancies between the Record Plan and the hotel, as built. In addition to submitting revised plans for parking spaces, WH discussed the possibility of opening only a portion of the hotel until the entire matter was resolved, but the County rejected that option. WH applied to the New Castle County Board of Adjustment for nine variances that, if granted, would have enabled WH to obtain a CO. The Board held a two-day hearing in mid-July 2000 and announced its decision denying the application at the end of that month.[2]

In August 2000, WH asked the County to issue a temporary CO, allowing the first four floors of the hotel (102,120 square feet) to be opened. The County responded that no CO would be issued unless WH removed, or rendered unusable, the top two floors. In later discussions and correspondence, the County suggested either tearing down those floors or filling them with foam. In September, WH's lender met with the County, but the County remained steadfast in its position. As a result, the lender demanded that WH bring the hotel into compliance with all applicable codes; declared WH's loan in default; and required WH to deposit $1.5 million in additional collateral.

On October 20, 2000, WH filed an action in the Court of Chancery seeking a mandatory injunction requiring the County to issue a CO. The Vice Chancellor was appointed an acting Superior Court judge in order to give him jurisdiction to hear and decide all matters relating to the hotel,

---

**2.** The Board issued a written decision on September 29, 2000.

including WH's appeal of the Board's decision denying the variances. After denying WH's motions for a temporary restraining order and a preliminary injunction, the court set a trial date for November 28, 2000. The day before trial, however, WH notified the Court of Chancery that it was not ready to proceed. WH never prosecuted its Chancery action, which was dismissed in 2005.

While seeking a resolution that would allow the hotel to open, WH also explored the possibility of selling the hotel. The County advised that it would be willing to work with a new owner, but that the deed to the new owner would have to include a restriction barring the Capano and Vietri families from having any interest in the hotel for 20 years. In a letter dated February 2, 2001, the County advised WH of the items that had to be resolved before a temporary or permanent CO would be issued to any buyer. The February 2 letter indicates that, instead of foaming or tearing down the top two floors of the hotel, those floors could be made inaccessible by locking all the doors and eliminating elevator access.

WH found two potential buyers, and entered into an agreement of sale with Reese Hotels, LLC in November 2001. By that time, the lender had instituted foreclosure proceedings and WH had declared bankruptcy. The Reese sale, which was approved by the bankruptcy court, would have netted WH approximately $7.45 million after repaying the lender. That sale never closed, however, because the County would not issue a CO. In a letter dated November 2, 2001, the County explained that the February 2 letter reflected the terms of a possible settlement that the Court of Chancery had asked the parties to discuss. The parties did not reach agreement, and the County's November letter advised that no CO would be issued

until the unauthorized excess floor space was removed.

Before agreeing to sell the hotel to Reese, WH had entered into a settlement agreement with its lender. The settlement agreement gave WH until March 31, 2002, to pay the lender $13.85 million in satisfaction of its outstanding debt. WH failed to make the payment, and the lender took title to the hotel in April 2002. One year later, the lender sold the hotel to Parkside V, LLC for $11.2 million. Parkside also acquired an adjacent parcel of land and used some of that additional land to address parking and other problems identified by the Board in its denial of WH's application for nine variances. On January 20, 2004, the Board approved Parkside's application for six variances. Because Parkside included the deed restriction that the County had insisted upon, it was not required to tear down the top two floors of the hotel.

WH filed this action in the Superior Court on July 29, 2003. The complaint purports to allege four claims against the County: 1) violation of substantive due process, based on the County's alleged bad faith and its "arbitrary and irrational conduct and . . . egregious abuse of power which shocks the conscience;" 2) violation of equal protection, based on the County's alleged failure to treat WH in the same manner as similarly situated landowners; 3) a taking of WH's property without just compensation, based on the County allegedly depriving WH of all economically viable use of its property (inverse condemnation); and 4) breach of contract, based on the County's refusal to issue a temporary CO under the terms of an agreement allegedly set forth in the County's February 2, 2001 letter.

The Superior Court dismissed the due process and inverse condemnation claims for failure to state a claim upon which

relief could be granted. The trial court also denied WH's motion to amend the complaint to allege a temporary or partial taking by the County. After trial, the jury found in favor of WH on the equal protection claim and awarded WH $7.5 million in damages. The jury found in favor of the County on the breach of contract claim. The trial court denied the County's post-trial motions and this appeal followed.

## DISCUSSION

 WH's equal protection claim is a "class of one" claim. In *Village of Willowbrook v. Olech*,[3] the United States Supreme Court explained the nature of such a claim:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

Thus, the two critical components of WH's equal protection claim are: 1) that there were similarly situated developers that were treated differently; and, 2) that the County had no rational basis to treat WH as it did. To prevail on the first prong, WH must establish "an extremely high degree of similarity"[4] between its circumstances and those of others who were treated differently ("comparators"). Stated another way, the comparators must be "*prima facie* identical in all relevant respects."[5] Generally, this is a fact question for the jury, but summary judgment is appropriate "where it is clear that no rea-

sonable jury could find the similarly situated prong met."[6] If WH establishes disparate treatment, it then must prove that the County lacked any rational basis for that treatment. This prong, too, is subject to summary disposition.[7]

The trial court denied the County's motion for summary judgment, without addressing the relevant standards or analyzing the record. The trial court simply concluded that there were genuine issues of material fact in dispute. The record is clear, however, that none of WH's comparators were similarly situated. WH applied for nine variances that would, among other things, increase the maximum permitted size from 118,805 to 158,176 square feet; reduce the number of parking spaces from 325 to 202; and reduce setbacks, open space requirements and buffers. The Board found, based on documents and testimony of numerous witnesses, that WH did not act in good faith:

> The applicant acknowledged that he had to have been aware of the square footage limitations at some point, however, this limitation never factored into his considerations for the project. There is evidence in the record to indicate that the applicant (or his agents) was repeatedly given the opportunity to discover the discrepancy between the record plan and the proposed building size. Many of these opportunities occurred prior to the time construction commenced.... Moreover, there was evidence submitted to suggest that the developer was aware of the discrepancy and took affirmative steps to conceal the

**3.** 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

**4.** *Cordi–Allen v. Conlon*, 494 F.3d 245, 251 (1St Cir.2007) (Quotations omitted.).

**5.** *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir.2002).

**6.** *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir.2001).

**7.** *Id.* at 500.

discrepancy from third parties. In particular, the Artesian Water letters (with the changed square footage numbers) and the representation in the HVS appraisal that the developer had communicated to it that, despite the record plan's square footage limitation of 118,805, the "correct figure" was 156,000 square feet, are illustrative of this point. Both of these representations occurred prior to the time construction commenced....[8]

Only two of the comparators relied upon by WH are hotels. Because the use of a proposed development is "quite relevant," WH's remaining comparators must be rejected as not sufficiently similar.[9] The two hotel projects are Krishnas, LLC and Parkside V, LLC. Krishnas sought a variance permitting construction of a 31,412 square foot hotel, which would be 2,228 square feet larger than permitted by code and 3,063 square feet larger than the record plan. The Board granted the variance, after finding that the overbuild was the result of an innocent mistake; that the dimensional change was minimal; and that it would "result in no appreciable harm to the surrounding community."[10]

The second hotel project, Parkside, was a request for six variances for the same hotel previously owned by WH. In approving the Parkside variances, the Board noted:

> Unlike WH, the current Applicant is not tainted with bad faith. Thus, one of the Department's primary objections to the granting of variances is eliminated.... Another major difference is with the degree of the variance requests. WH sought much wider relief ... and made minimal attempts to comply with any Code provisions. Rather than provide real parking alternatives, WH simply pursued the argument that 202 parking spaces would be sufficient. This was a major concern of the Department. However, the Applicant has addressed the Department's primary site concern—insufficient parking—by acquiring land and proposing additional parking spaces....

> * * *

> Applicant has significantly increased the size of the Hotel Site by acquiring the State Property and restricting the Mitigation Site from future development.... Although the additional land is located in the floodplain, the Parkside Plan provides the protection to the community that the UDC is designed to offer through its site capacity limitations.

> * * *

> The entire Hotel Site is located within the floodplain.... Granting the variances could result in increased stormwater runoff and sedimentation on adjoining properties.... The harm to neighboring property and the community from these environmental threats has not been ignored by the Parkside. Applicant has offered that they are in discussions with Delaware Department of Transportation to acquire additional land along the perimeter of this site.... Applicant has represented that landscaping will be provided ... and the area will be revegetated. Additionally, redesigned stormwater management and riparian buffer enhancements will be provided.[11]

8. WH Board of Adjustment Decision, Appellant's Appendix, A 092.

9. *Campbell v. Rainbow City, Alabama*, 434 F.3d 1306, 1314 (11th Cir.2006).

10. Krishnas, LLC Board of Adjustment Decision, Appellant's Appendix, A 044.

11. Parkside V, LLC Board of Adjustment Decision, Appellant's Appendix, A 222–25.

In light of the high degree of similarity required to state a "class of one" equal protection claim, there is no question but that WH's comparators were not similarly situated. Krishnas overbuilt as a result of an innocent mistake, and sought only one variance for a "minimal" dimensional change that would result in no harm to the neighborhood. "[D]evelopments seeking different variances cannot be considered similarly situated."[12] WH sought nine variances covering a much more significant dimensional change, as well as parking, setback, buffer and other changes. Thus, even if one were to ignore the good faith difference, the Krishnas application would not be sufficiently similar to support WH's claim.

The Parkside application also fails as a comparator. Although Parkside applied for variances relating to the same hotel as WH, there were significant differences between the two applications. Parkside did not act in bad faith and requested only six variances. Moreover, Parkside purchased adjoining property and used that property to provide the required parking, whereas WH wanted a variance to allow it to operate with significantly fewer parking spaces. Finally, Parkside represented that it would purchase another adjoining parcel to provide environmental/buffering protection.

■ WH's equal protection claim should have been dismissed for failure to present comparators that were similarly situated. The same result would have obtained under the second prong—the rational basis test. Although it is not necessary to our decision, we reach this issue because WH apparently convinced the trial court that its equal protection claim encompassed all of its interactions with the County. To demonstrate that the County's actions were arbitrary and vindictive, WH focused on facts such as: 1) the County Executive's apparent dislike for the WH principals, inferable from his statement that WH would not get a CO as long as he was County Executive, and his pleasure at the fact that WH declared bankruptcy; 2) the County's allegedly unreasonable demand that WH either tear down or foam in the top two floors of the hotel in order to obtain a temporary CO; and 3) the County's allegedly punitive demand that the principals of WH and their families not retain any interest in the hotel after it was sold.

In pursuing this theory, WH ignores the fact that it knowingly built a hotel that did not comply with applicable zoning and building codes. As a result, WH could not be issued a CO until it brought the hotel into compliance—either by modifying the hotel or by obtaining variances for any non-compliance.[13] The Board denied WH's application for variances based on factual findings and legal conclusions supported by the evidence, including a finding that WH knew it was overbuilding and acted in bad faith. WH abandoned its appeal of that decision, and presented no evidence questioning the Board's fairness or impartiality. Thus, the Board's decision stands, and no reasonable juror could find that it was irrational or arbitrary.

■ Without the needed variances, WH's only options were to bring the hotel into compliance (which would be prohibitively expensive) or to sell the hotel to an entity that, because it would not be tainted by WH's bad faith, would have a better chance of obtaining the variances. The County was under no obligation to assist WH in working its way out of this self-

---

12. *Campbell v. Rainbow City, Alabama,* 434 F.3d at 1316.

13. *See:* 9 Del.C. §§ 1313, 2511.

created dilemma. From the County's perspective, WH had tried to "get away" with ignoring the Code, and it was not going to help WH by making concessions or granting temporary COs. WH never attempted to show that the County had been more generous with other developers who knowingly overbuilt and were denied variances. Absent such a showing, WH had no claim.

In its cross-appeal, WH contends that the trial court erred in dismissing its due process and inverse condemnation claims, and that the trial court should have allowed WH to amend its complaint to state a partial taking claim. We find no merit to these arguments and affirm on the basis of the trial court's decisions dated August 4, 2004, October 4, 2004 and May 24, 2005.

## CONCLUSION

Based on the foregoing, the judgment in favor of WH is reversed and this matter is remanded for entry of judgment in favor of the County on all claims.