[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11236

Non-Argument Calendar

_____

MARY A. HARRIS,

Plaintiff-Appellant,

*versus*

MONROE COUNTY PUBLIC LIBRARY BOARD OF
TRUSTEES,
MONROE COUNTY COMMISSION,
ANN PRIDGEN,
In her Individual and Official Capacity,
SHANNON POWELL,
In her Individual and Official Capacity,
JEROME SANDERS,
In his Individual and Official Capacity,
STEVE STACEY,

In his Individual and Official Capacity,

                                                    Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:19-cv-00265-CG-N

————————————

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

After being terminated from her position at the Monroe County library, appellant Mary A. Harris sued the Monroe County Public Library Board of Trustees (the "Library Board"), four individuals who were members of the Library Board (the "board members"), and the Monroe County Commission (the "Commission"). The district court dismissed Ms. Harris's claims against the Commission and later granted summary judgment to the Library Board and the individual board members. After careful consideration, we affirm.

**I.**

Ms. Harris, a Black woman, worked at the Monroe County library for approximately 35 years.[1] The library's operations are overseen by the Library Board, a non-profit corporation organized under Alabama law. *See* Ala. Code § 11-90-2 (providing that the "government and supervision" of free public libraries "shall be vested in a library board"). The Library Board consists of five members who are selected by the Commission and receive no compensation. *See id.* During the relevant period, three board members were White and two were Black.

The Library Board has the "full power and authority" to "[m]anage and control" the operations of the library. Ala. Code § 11-90-3(a)(6). Its responsibilities include "engag[ing] . . . employees for the day-to-day operation" of the library. Doc. 94-2 at 2.[2] The library's employees are "deemed public employees" and are "entitled to all benefits and privileges generally afforded public employees in the State of Alabama." *Id.*

During her lengthy tenure, Ms. Harris held several different positions at the library. Throughout her employment, Ms.

---

[1] Given our standard of review at the summary judgment stage, in recounting the facts of this case, we accept Ms. Harris's version of disputed facts and draw all reasonable inferences in her favor. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002).

[2] "Doc." numbers refer to the district court's docket entries.

Harris never signed a written contract for employment with the library or the Library Board.

In 2016, the library's former director retired, and the Library Board appointed Ms. Harris as interim director. Ms. Harris applied for the permanent director position. The Library Board interviewed three finalists for the position: Ms. Harris; Crystal Reynolds, a White woman, and Brenda Taite, a Black woman.

After interviewing the three finalists, the Library Board unanimously agreed that Ms. Reynolds was the most qualified candidate and offered her the position. The Library Board notified Ms. Harris that she had not been selected. Ms. Reynolds ultimately declined the director position, and the Library Board restarted the application process. As a result, even though Ms. Harris was not selected for the permanent director position, she continued to serve as interim director.

While Ms. Harris continued to serve as interim director, issues arose when Steve Stacey, who had recently been appointed to the Library Board, organized an event at the library to celebrate Confederate Memorial Day. According to Mr. Stacey, he organized the event pursuant to the library's "policy of hosting a program in conjunction with every State-recognized holiday."[3]

---

[3] It is unclear whether such a policy actually existed. Mr. Stacey believed this policy existed because the library held a program in February for Black History Month. But Black History Month is not a holiday under Alabama law. *See* Ala. Code § 1-3-8(a). In addition, the record reflects that Mr. Stacey's

Doc. 94-3 at 3. *See* Ala. Code § 1-3-8(a), (b)(3) (designating the fourth Monday in April as Confederate Memorial Day and a state holiday).

For Confederate Memorial Day, Mr. Stacey, a former commander of the Sons of Confederate Veterans,[4] planned two presentations at the library. For the first presentation, he delivered a lecture entitled "History of Units Raised in Monroe County with a Discussion of Units [F]ormed in Neighboring Counties with Men from Monroe." Doc. 100-2. In the second presentation, Frank Pierce, a commander with the Sons of Confederate Veterans, delivered a lecture entitled "CSA Cavalry Equipment & Arms with Discussion of 7th Alabama Calvary in Forrest's Command." *Id.* Mr. Pierce's presentation was about Confederate troops under the command of Nathan Bedford Forrest, who later served as the first grand wizard of the Ku Klux Klan. Mr. Stacey served as moderator for Mr. Pierce's presentation.

According to Mr. Stacey, these presentations were about "matters of historical significance in Monroe County pertaining to the Civil War" but did not relate to "slavery . . . or race whatsoever." Doc. 94-3 at 3. Although Mr. Stacey denied that the event

---

event was the first time that the library hosted an event related to Confederate Memorial Day.

[4] The Sons of the Confederate Veterans is an organization for "descendants of men who served in the Confederate Army." Doc. 100-1 at 2. In the organization, a commander is the equivalent of a chapter president.

was intended to celebrate the Confederacy, flyers promoting the event stated that its purpose was to "[c]elebrate." Doc. 100-2. The flyers also promised, "[w]e will assist you in learning the unit your ancestor served [in] and the battles he fought." *Id.*

Given that the library was hosting an event that appeared to celebrate the Confederacy, was intended for those whose family members had fought for the Confederacy (that is, Monroe County's White community), and included a presentation focusing on the leadership of a man who also served as the first grand wizard of the Ku Klux Klan, it is perhaps unsurprising that some Black community members in Monroe County voiced concerns about the event. Mr. Stacey nevertheless proceeded with the event and refused to speak with these community members about their concerns.

Seventy people attended the Confederate Memorial Day event. According to Ms. Harris, approximately 50 of the attendees were men and 20 were women.[5] Nearly all of the attendees were White; other than Ms. Harris, there were only two Black attendees. Ms. Harris saw attendees come to the event "with Confederate flags." Doc. 94-4 at 78.

Ms. Harris attended Mr. Pierce's presentation for about 10 to 15 minutes. A few minutes before the presentation began, a male attendee called Ms. Harris "the N word." *Id.* at 71–72. Alt-

---

[5] According to Mr. Stacey, only seven of the attendees were men.

22-11236                Opinion of the Court                7

hough Ms. Harris did not observe anything "inappropriate" during the presentation, she left because she became "uncomfortable" and was worried about what was going to transpire. *Id.* at 68–69. She was "very upset" after the program, particularly because of the legacy of slavery and Monroe County's history of racism.[6] *Id.* at 73.

After the event, Ms. Harris filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she has been discriminated against because of her race.[7] In her charge, Ms. Harris recounted that she had not been selected for the director position. She also discussed the library event, which she said "celebrate[d] the Confederate Flag" and was attended by over 70 participants who were "known Ku Klux Klan affiliates." *Id.* at 93. Ms. Harris also asserted that she had been retaliated against for complaining about racial discrimination. The EEOC ultimately closed its file on the charge because the Library Board employed fewer than 15 employees and thus was not covered by Title VII.[8] *See Lyes v. City of Riviera Beach*,

---

[6] The record reflects that at least 18 lynchings occurred in Monroe County.

[7] Ms. Taite, the other Black finalist for the director position, also filed a charge with the EEOC.

[8] Congress has authorized the EEOC to investigate charges that employers engaged in unlawful discrimination in violation of Title VII or certain other federal employment statutes. *See* 42 U.S.C. § 2000e-5(b) (Title VII); *see also* 29 U.S.C. § 626(a) (Age Discrimination in Employment Act); 42 U.S.C. § 12117 (Americans with Disabilities Act). Congress has not authorized the

166 F.3d 1332, 1340–41 (11th Cir. 1999) (explaining that Title VII's prohibitions on discrimination apply to employers with 15 or more employees).

A local newspaper reported on Ms. Harris's allegation that Ku Klux Klan affiliates had attended the library's Confederate Memorial Day event. Several community members complained to the Library Board about this allegation. Community member Loretta McKenzie wrote that she was "highly offended" and "extremely upset" by the "unjust accusation" that "70 known members of the KKK attended" the event. Doc. 94-3 at 29. She accused Ms. Harris of having a "racist agenda" and demanded that Ms. Harris be "dismissed immediately." *Id.* Others threatened to sue over the allegation.

After receiving these complaints, the Library Board requested a meeting with Ms. Harris. Ms. Harris briefly attended the meeting but then left the meeting and would not return.

After Ms. Harris refused to rejoin the meeting, Library Board member Ann Pridgen recommended that Ms. Harris be terminated "due to defamation of character concerning the allegations that 70 citizens that attended a program at the library were members of the KKK." Doc. 100-5. The four members of the board who were present at the meeting (Mr. Stacey, Ms. Pridgen,

---

EEOC to investigate charges that employers violated the Fourteenth Amendment.

Shannon Powell, and Jerome Sanders) voted to terminate Ms. Harris's employment.

Following the vote, the Library Board delivered to Ms. Harris a letter terminating her employment. The letter stated that the Library Board was "shocked" by the allegation that Ku Klux Klan affiliates had attended the Confederate Memorial Day event. Doc. 94-3 at 31. It asserted that this allegation was false because "[w]omen cannot be members of the KKK" and most of the attendees at the Confederate Memorial Day event were women.[9] *Id.* The Library Board wrote that Ms. Harris's conduct left it with "no choice" but to terminate her employment effective immediately. *Id.*

Ms. Harris filed this lawsuit, bringing claims under 42 U.S.C. § 1983 against the Library Board, the four individual board members who voted for her termination, and the Commission. First, she alleged that the defendants violated her right to due process under the Fourteenth Amendment by terminating her without holding a pre-termination hearing. Second, she claimed that they violated her right to equal protection under the Fourteenth Amendment by terminating her based on her race. Third, she asserted that they violated her right to equal protection

---

[9] Library Board members knew from "past experience" that women could not be members of the Ku Klux Klan. Doc. 100-3 at 5.

under the Fourteenth Amendment by terminating her in retaliation for her filing an EEOC charge.[10]

The Commission filed a motion to dismiss. The district court concluded that Ms. Harris failed to state a claim for relief against the Commission because "beyond the fact that [the Commission] appointed the [board members], [she] has failed to allege any facts . . . indicating how [the Commission] was involved in the events underlying her claims." Doc. 45 at 13. Accordingly, the district court granted the Commission's motion and dismissed the claims against it.

After the parties completed discovery, the Library Board and the four board members filed motions for summary judgment. The district court granted the motions. First, the district court found that there was no due process violation because the undisputed evidence showed that Ms. Harris was an at-will employee who had no property interest in her continued employment. The district court also ruled, in the alternative, that there was no due process violation because the undisputed facts

---

[10] Ms. Harris also alleged that the defendants violated her right to equal protection by failing to promote her to director because of her race. In addition, she brought a claim for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* The district court granted summary judgment on these claims. Because Ms. Harris does not argue on appeal that the district court erred in granting summary judgment on either claim, we discuss them no further.

showed that Ms. Harris was given an opportunity to be heard prior to her termination.

Second, the district court considered the equal protection claim alleging that Ms. Harris was terminated because of her race. Ms. Harris argued that she had come forward with sufficient circumstantial evidence to allow a factfinder to infer that she was terminated because of her race. The district court disagreed, concluding that the evidence did not support an inference that Ms. Harris was terminated because of her race.

Third, the district court turned to the claim that the Library Board and the board members engaged in retaliatory conduct that violated the Fourteenth Amendment's Equal Protection Clause. Because binding precedent made clear that there was no viable claim for retaliation under the Equal Protection Clause, the district court granted summary judgment on this claim as well.

This is Ms. Harris's appeal.

## II.

We review *de novo* a district court's grant of summary judgment, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III.

Ms. Harris argues on appeal that the district court erred in granting summary judgment to the Library Board and the board members on her claims that (1) her right to due process under the Fourteenth Amendment was violated because she was denied procedural due process when she was terminated, (2) she was denied equal protection in violation of the Fourteenth Amendment when she was terminated because of her race, and (3) she was denied equal protection in violation of the Fourteenth Amendment when she was terminated in retaliation for complaining about racial discrimination. We consider each issue in turn.

### A.

We begin with the claim that the Library Board and the individual board members violated Ms. Harris's due process rights by terminating her employment without an adequate pre-termination hearing. To establish a procedural due process violation, Ms. Harris had to show that she (1) had a property interest that she was deprived of by state action and (2) received insufficient process concerning that deprivation. *Ross v. Clayton Cnty.*, 173 F.3d 1305, 1307 (11th Cir. 1999). We focus here on the requirement that Ms. Harris show that she was deprived of a property interest.

Ms. Harris argues that she had a property interest in her continued employment. To have a property right in continued employment under Alabama law, "the crucial question is whether the employment is terminable 'at will' or whether the employer's

discretion to discharge the employee is somehow fettered." *Green v. City of Hamilton, Hous. Auth.*, 937 F.2d 1561, 1564 (11th Cir. 1991). An employer's discretion to discharge a public employee is restricted when a "state law or local ordinance in any way limits the power of the appointing body to dismiss [the] employee." *Ross*, 173 F.3d at 1307 (internal quotation marks omitted). An employer's discretion to terminate a public employee also may be limited if it agreed in a contract that the employee could be dismissed for certain reasons only. *See Green*, 937 F.2d at 1564. But if the employment is "at will," meaning the employer's discretion to discharge is unfettered, the public employee does not have a property interest in continued employment and is "not entitled to procedural due process in connection with her termination." *Adams v. Bainbridge–Decatur Cnty. Hosp. Auth.*, 888 F.2d 1356, 1366 (11th Cir. 1989).

We conclude that Ms. Harris was an at-will employee. She has not identified, and we have not found, any Alabama law or local ordinance that limited the Library Board's authority to discharge her. And she has come not forward with evidence of any contract that limited the Library Board's discretion to terminate her for any reason. Because Ms. Harris was an at-will employee, she did not have a property interest in her continued employment and was not entitled to procedural due process in connection with her termination. *See id.*

**B.**

We next turn to the claim that the Library Board and the individual board members violated Ms. Harris's right to equal protection by terminating her because of her race.

"[T]he Equal Protection Clause requires government entities to treat similarly situated people alike." *Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006). It "prohibits race . . . discrimination in public employment." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018). An employment discrimination claim against a state actor for a violation of the Equal Protection Clause is "subject to the same standards of proof and use[s] the same analytical framework as discrimination claims brought under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981." *Id.* at 1312 n.6. Among other things, the employee "must establish the employer's discriminatory intent." *Id.* at 1312.

A plaintiff may use either direct evidence or circumstantial evidence to establish intent. *Id.* "Direct evidence is evidence that, if believed, proves the existence of discriminatory intent *without inference or presumption.*" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (alterations adopted) (emphasis added) (internal quotation marks omitted). "In contrast, circumstantial evidence only suggests, but does not prove, a discriminatory motive." *Id.* at 921–922 (internal quotation marks omitted). When a plaintiff relies on circumstantial evidence, she may establish that the defendant acted with a discriminatory intent by relying on the burden-shifting framework set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973), or by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1327–28 (11th Cir. 2011) (internal quotation marks omitted) (footnote omitted).

We have previously addressed what types of statements qualify as direct evidence. "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor[,] constitute direct evidence of discrimination." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020 (alteration adopted) (internal quotation marks omitted). An example of direct evidence would be a manager saying, "Fire Earley—he is too old." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (internal quotation marks omitted); *see also Jefferson*, 891 F.3d at 922 (treating manager's statement that plaintiff was not hired because company "wanted a Korean in that position" as direct evidence (internal quotation marks omitted)).[11]

---

[11] Ms. Harris says that in *Wright v. Southland Corporation*, we adopted a different standard for determining when a statement qualifies as direct evidence and recognized that direct evidence may require the hearer "to make at least one inference to connect the dots between the comment and the protected personal characteristic." Appellant's Br. at 18 (citing *Wright*, 187 F.3d 1287, 1295–98 (11th Cir. 1999)). Ms. Harris's reliance on Judge Tjoflat's opinion in *Wright* is misplaced. Neither of the other two members of the panel joined the opinion; they concurred in the result only. *See* 187 F.3d at 1306 (Cox, J., concurring in result only); *id.* (Hull, J., concurring in result only). What is

On appeal, Ms. Harris argues that she introduced "direct evidence of discrimination." Appellant's Br. at 17. We disagree. She has identified no statement that, if believed, shows "without inference or presumption" that she was terminated because of her race. *Jefferson*, 891 F.3d at 921.

Because Ms. Harris did not introduce any direct evidence of discrimination, the district court correctly analyzed her race-discrimination as one based on circumstantial evidence. Although Ms. Harris argued in the district court that she introduced sufficient circumstantial evidence to survive summary judgment under a convincing mosaic theory, she does not raise any argument on appeal challenging the district court's conclusion that she failed to establish a convincing mosaic of circumstantial evidence. Accordingly, she has forfeited any challenge to the district court's determination that she failed to introduce circumstantial evidence of discrimination. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc).

## C.

We now consider Ms. Harris's claim that the Library Board and the individual board members violated her right to equal pro-

---

more, both before and after *Wright*, we have defined direct evidence as "evidence, which if believed proves existence of fact in issue without interference or presumption." *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (internal quotation marks omitted); *Jefferson*, 891 F.3d at 921 (same).

tection when they terminated her in retaliation for her complaints about race discrimination. This claim fails because we have recognized that the Equal Protection Clause does not establish a general right to be free from retaliation for making complaints of discrimination. *See Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) (holding that a retaliation claim "simply does not implicate the Equal Protection Clause").

Ms. Harris does not dispute that in *Watkins* we held there is no right to be free from retaliation under the Equal Protection Clause. But she says that *Watkins* is no longer good law after the Supreme Court's decision in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005). We disagree.

Under our prior-panel-precedent rule, we are bound by *Watkins* unless it has been "overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). An "intervening decision of the Supreme Court can overrule the decision of a prior panel" only when the Supreme Court's decision is "clearly on point." *Id.* (internal quotation marks omitted).

The Supreme Court's decision in *Jackson* did not overrule or abrogate our decision in *Watkins*. In *Jackson*, the Supreme Court considered whether the private right of action implied by Title IX, which prohibits discrimination in any education program receiving federal funding, encompassed claims of retaliation. 544 U.S. at 171. After considering the broad statutory language in Title IX as well as the fact that Title IX was enacted after the Su-

preme Court had construed other statutes prohibiting discrimination to cover retaliation claims, the Court held that Title IX's private right of action encompassed retaliation. *Id.* at 173–77. Because nothing in *Jackson* addressed the Equal Protection Clause, we cannot say that *Jackson* was so clearly on point that it overruled *Watkins. See Archer*, 531 F.3d at 1352; *see also Wilcox v. Lyons*, 970 F.3d 452, 463 (4th Cir. 2020) ("We do not read the Court's decision in *Jackson* to suggest that . . . the Constitution's aged guarantee of equal protection . . . necessarily incorporates a right to be free from retaliation for reporting discrimination.").

## IV.

Ms. Harris understandably found the events at the library immensely disturbing and frightening. But it is not our role in this case to rule on the propriety of the defendants' behavior. Instead, we must apply the law to the claims before us. For the reasons set forth above, we affirm the district court's judgment.

**AFFIRMED.**